**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marie Maese-Thomason, | No. CV-20-08338-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Embry-Riddle Aeronautical University, et al., | |
| Defendants. | |

Marie Antoinette Maese-Thomason ("Plaintiff") has sued her former employer, Embry-Riddle Aeronautical University, Inc. ("Defendant"), for employment discrimination in violation of the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. 9.)  Now pending before the Court is Defendant's motion for partial summary judgment.  (Doc. 48.)  For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

I.     Relevant Facts

The following facts are derived from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.

In 2012, Plaintiff began working for Defendant as the women's softball coach. (Doc. 9 ¶ 10; Doc. 13 ¶ 10.)

In 2014, several then-current and former members of the women's softball team

complained to Defendant's Title IX Office about discrimination by Plaintiff.  (Doc. 48-2 at 88.)  On February 10, 2015, after finding no support for the allegations, Defendant closed the investigation.  (*Id.*)

At all relevant times until July 2017, Ted Blake served as Defendant's athletic director (and Plaintiff's indirect supervisor).  (Doc. 48-2 at 84; Doc. 54-2 at 2-4 ¶¶ 4, 15.)  Plaintiff contends that "throughout [her] tenure," and despite her "high level of coaching experience," Blake treated her as "unskilled," "constantly questioning [her] coaching tactics" and explaining "how to coach . . . softball."  (Doc. 54-2 at 20.  *See also id.* [Plaintiff's notes describing a "lengthy conversation" with Blake in 2017 during which he said that he could coach softball and compared his skillset to Plaintiff's skillset].)  Additionally, Plaintiff contends that "[o]n more than one occasion, . . . Blake would burst into [Plaintiff's] office aggressively, and anything he didn't agree with that [Plaintiff] did in a game . . . [he] yelled at [her] about . . . .  He spoke aggressively to [Plaintiff], and he was aggressive in his mannerisms in [her] small office."  (Doc. 48-2 at 18.)

In April 2017, one of Plaintiff's players came to Plaintiff's office to report sexual harassment by a third party.  (*Id.*)  The incident involved "vulgar" text messages and "a picture of a male's genitals."  (*Id.*)  The next day, Blake "burst into [Plaintiff's] office" and asked Plaintiff if she had seen the photograph.  (Doc. 54-4 at 148.)  Blake then stated: "Well, he's a black man, and a black man's penis will look very different."  (*Id.*)

Around the same time, after the women's softball team missed the playoffs, "Blake came into [Plaintiff's] office and basically laid into [her] for the season."  (Doc. 48-2 at 22-23.)  During the same encounter, Blake told Plaintiff that Jaime Long, Defendant's then-assistant athletic director (and Plaintiff's direct supervisor), had met with one of Plaintiff's players about an alcohol issue outside Plaintiff's presence.  (*Id.* at 23.)  This violated "the Scholar-Athlete Handbook," which "states that . . . the coach and the player will be present."  (*Id*.)

On April 28, 2017, Plaintiff requested a meeting with Sara Heffelfinger, Defendant's head of human resources ("HR"), "to discuss complaints of gender

discrimination and sexual harassment" by Blake.  (Doc. 54-2 at 2 ¶ 4; Doc. 54-4 at 10.)
During the resulting meeting, which took place on May 1, 2017, Plaintiff reported Blake's
behavior and Long's "lack of adherence to protocol."  (Doc. 54-4 at 26 [complaint to the
Office of Civil Rights ("OCR") describing this meeting]; Doc. 48-2 at 23 [Plaintiff's
deposition testimony, describing this meeting].)  In response, Heffelfinger suggested that
Plaintiff "may not be the right fit" for Defendant, described the complaint as "a junior
problem for HR," and recommended that Plaintiff address Long directly.  (Doc. 54-4 at 26;
Doc. 48-2 at 23.)

On May 23, 2017, Blake met with Plaintiff to go over Plaintiff's performance
evaluation.  (Doc. 54-2 at 3 ¶ 9.)  Although Plaintiff received an overall rating of "Meets
Expectations," she received "Needs Improvement" ratings for three performance
objectives: (1) job knowledge and skills; (2) communication skills; and (3) interpersonal
relationships.  (Id. at 9.)  She was also placed on a Performance Improvement Plan ("PIP").
(Doc. 54-2 at 15; Doc. 54-4 at 126.)  During the meeting, Blake stated that he had talked
to Heffelfinger, that Heffelfinger "was on board" with the PIP, and that his "biggest
concern" was "when people complain[,] they don't come in here and complain."  (Doc.
54-2 at 3 ¶ 10.)  Due to the PIP, Plaintiff did not receive an annual raise.  (Doc. 54-2 at 3
¶ 11; Doc. 54-4 at 126.)

"[A] couple of days later," Plaintiff relayed the events surrounding her HR
complaint and the PIP to Elizabeth Frost, who was Defendant's Title IX coordinator.  (Doc.
54-2 at 3 ¶ 12; Doc. 54-3 at 4.)   Frost stated "that what [Blake] was doing was
discrimination" and that Plaintiff could file a complaint with OCR.  (Doc. 54-2 at 3 ¶ 12.)

Shortly thereafter, Plaintiff contacted "an attorney resource through the National
Fastpitch Coaches Association, and attorney Samantha Ekstrand began assisting [Plaintiff]
with the issues [she] was facing."  (Id. at 3 ¶ 13.)

In June 2017, Plaintiff spoke with Adam Pearce, the men's soccer coach, about the
situation with Blake.  (Id. at 3 ¶ 14.)  On June 13, 2017, Pearce emailed Plaintiff the
following: "I think you have a major case for why and how things have been mismanaged

from the university side of things.  Furthermore, I think it's important to note your conversation with HR where they told you that 'you may not be a good fit for [Defendant].' All points to you being discriminated against.  I don't think you are in the wrong in defending yourself legally and believe it would not be held against you if you sought employment elsewhere . . . ."  (Doc. 54-4 at 151.)

In early October 2017, Plaintiff met with Long to discuss "team issues such as complaining about the athletic trainers and lack of work ethic and attitude by some players."  (*Id.* at 29.)  Long instructed Plaintiff to "address the team about the training room" and to "either run the player not hustling or run the team for the player not hustling." (*Id.*)

On October 25, 2017, Plaintiff met with Long and Rudy Baca, an assistant coach for the women's softball team, to discuss a player's "behavior change."  (*Id.*)  As relevant here, during the meeting, Long told Plaintiff: "you can't use running as punishment, that could be construed as bullying."  (*Id.*)  Plaintiff "was confused as earlier in the fall, [Long] told [her] to use running as a form of discipline."  (*Id.*)

The same month, seven then-current and former members of the women's softball team met with Frost to complain about Plaintiff and report "several perceived incidents of discrimination retaliation intimidation harassment and bullying dating back to the fall 2015 semester."  (Doc. 48-2 at 90.)  Defendant assigned Title IX Investigator Deborah Campbell to investigate the allegations.  (Doc. 48-2 at 90-91; Doc. 54-2 at 5 ¶ 32.)

On November 6, 2017, Campbell sent Plaintiff a letter notifying her of the investigation.  (Doc. 48-2 at 90.)  The letter identified the reporting parties and described the complained-of behaviors, which included (among other things): (1) "Discrimination, Harassment, intimidation, bullying, and verbal abuse based on self-disclosure of eating disorder regarding weight"; (2) "Verbal abuse repetitive put-downs comments being said to other players"; (3) "Prohibited physical activity told to participate in practice when not cleared by training staff"; and (4) "Bullying."  (*Id.*)  The letter also stated: "Based on speaking to three of the Reporting Parties . . . , I find there is sufficient evidence to show

- 4 -

some members of the Women's softball team may be subjected to a hostile environment under your coaching practices and I will initiate an investigation into these allegations. . . . [Y]ou are hereby being investigated for possible violation of . . . the University's Civil Rights Equity Sex/Gender-Based Harassment Discrimination and Sexual Misconduct Policy and APPM 8.3.2 Work Rules Policy (Section J: Engaging in other practices that may be inconsistent with the ordinary and reasonable rules of conduct necessary to the mutual welfare of the University its employees and students)." (*Id.* at 90-91, emphasis omitted.)

When Campbell "handed [Plaintiff] the formal investigation letter," Plaintiff told Campbell that she was suffering from post-traumatic stress disorder ("PTSD"). (*Id.* at 26.) Campbell responded: "Someone had told me that." (*Id.*) At that time "[t]he only two people [Plaintiff] had ever disclosed that [to] were Jaime Long and Liz Frost." (*Id.*)

On November 17, 2017, Campbell sent an email to the members of the women's softball team notifying them of the investigation and asking them to complete an attached questionnaire. (Doc. 54-2 at 38-45. *See also id.* at 46 [questionnaire].)[1]

Meanwhile, Plaintiff asked Long if she could work from home because she "was having some of the reporting parties show up unexpectedly in [her] office, which was stressful and upsetting as [she] was trying to compile [her] evidence in response." (*Id.* at 4-5 ¶¶ 29-30; Doc. 48-2 at 22, 112.) Long granted Plaintiff's request. (Doc. 48-2 at 22.) At home, Plaintiff continued to prepare evidence for the Title IX investigation. (*Id.* at 112.) She also attended counseling sessions. (*Id.*)

On December 13, 2017, as part of the Title IX investigation, Campbell emailed Plaintiff to schedule Plaintiff's formal interview. (Doc. 54-2 at 36.) Plaintiff responded:

> My counselor has offered to be my support person. . . . She also recommended, it may be beneficial to meet at her office, a more comforting and private setting for me. . . . I am picking up the accommodation request paperwork from her this afternoon for my disabilities (PTSD and

---

[1] The email also provided several relevant "policy definitions" from the "University Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination and Sexual Misconduct Resolution Policy" and outlined reporting parties' and witnesses' rights. (Doc. 54-2 at 38-45.)

ADD/Reading and Writing Comprehension Learning Disability) to turn in to you, making these requests. . . .

Lastly, my lawyer . . . said she is very likely going to be available to listen on the phone as we discussed in our first meeting.  She will only listen and not be communicating back and forth as we discussed.

(*Id.  See also* Doc. 54-4 at 169 [Disability Documentation And Accommodation Request Form].)  Campbell responded, in relevant part, as follows:

Our process only allows for one support person to be present (please refer to page 11-13 in the University's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination and Sexual Misconduct Resolution Process for additional information).  If your counselor is going to be your selection as your support person, I can accommodate your request for Friday December 22 at 8am, but it will need to be in my office. . . .

I do not require for you to submit any paperwork regarding accommodations to me.  Any paperwork requesting accommodations needs to be submitted to Sara Heffelfinger (Human Resources).  Can you clarify, are you making a request for accommodations for this investigative process or for general employment?  I just want to make sure I understand your statements in regards to submission of paperwork.

(Doc. 54-2 at 35.)

On December 15, 2017, Plaintiff responded: "Thank you for clarifying.  My counselor will be my support.  I have faxed the disability accommodation form to HR/[Heffelfinger].  I am requesting accommodation for the investigation process." (*Id.* at 37.)  Campbell responded: "I will work with [Heffelfinger] on Monday and have her advise me on what accommodations we will be providing." (*Id.*)  Ultimately, Plaintiff's request to meet at her therapist's office was "denied." (Doc. 54-2 at 5 ¶¶ 34-35.)

Also on December 15, 2017, Plaintiff emailed Long, stating in relevant part: "Upon finishing my documentation and meeting with [Campbell] next week, I would like to just take some PTO as well as the holiday to take a break.  I am hoping this will be sufficient in working with my counselor to get back to a good place." (Doc. 48-2 at 112.)

On December 22, 2017, Plaintiff met with Campbell at Campbell's office for Plaintiff's Title IX interview. (Doc. 54-2 at 5 ¶ 33-36.)  Plaintiff's counselor, Dr. Debbie Ritterbush, was also present for "most of the meeting." (*Id.* at 5 ¶ 33.)  Both Plaintiff and Campbell recorded portions of the interview. (Doc. 54-2 at 5 ¶¶ 41-42; Doc. 48-2 at 5,

125-230.)[2]

As relevant here, during the interview, Campbell stated: "I'm assuming especially with . . . women, that there's probably more gossipy stuff going on."  (Doc. 48-2 at 135.)  Additionally, Campbell told Plaintiff that "from talking to the girls, . . . that's been a little bit of an over-arching theme, that there's more criticisms and feeling that they are being shut down rather than, you know, hey, you missed that one, you'll get it the next time, you know, and pointing out strengths" and asked what Plaintiff had done to ensure "the whole team has fun."  (*Id.* at 153, 163.)  Plaintiff contends that she interpreted these (and similar) statements as suggesting that "female athletes should be coddled and have a 'say' in how the softball program was [run] by the coaching staff" and that Plaintiff should "nurture" her players rather than coaching them "competitively."  (Doc. 54-2 at 23, emphasis omitted.)  In a related vein, during the interview, Campbell questioned Plaintiff about several comments that Plaintiff had made to players, including: (1) "[I]f this was Little League, I'd play all the time.  But I'm here to win, so, I am going to play the best people"; and (2) "I've seen you walk faster when Starbucks was coming."  (Doc. 48-2 at 159, 175.)  Campbell also asked whether Plaintiff's mood influenced how she acted toward her players and whether Plaintiff had cried in front of her players (and, if so, why).  (*Id.* at 135, 148-49.)

The timeline of the Title IX investigation was also discussed.  Plaintiff expressed that she did not want the investigation to stop while she was on disability leave and Campbell indicated that this was fine; Dr. Ritterbush stated that it would be better for Plaintiff's health for the investigation to be "resolved."  (*Id.* at 198-200.)  Finally, Campbell stated that Plaintiff's PTSD would be disclosed in the formal statement that the reporting parties could read.  (*Id.* at 27-28.)[3]  Campbell included the information in a draft but, after

---

[2]     In support of its summary judgment motion, Defendant provided a transcript of Plaintiff's audio recording.  (Doc. 48-2 at 122 ¶ 7.)  The transcript (*id.* at 125-230) includes over four hours of conversation and appears to cut off while Plaintiff and Campbell were still talking.  (*Id.* at 230 [ending with Plaintiff stating: "I need to start taking care of myself. And what comes – ."].)

[3]     This exchange does not appear in the transcript of Plaintiff's audio recording.  (Doc. 48-2 at 125-230.)  However, Defendant does not dispute that it occurred (Doc. 48 at 4-5)

Plaintiff objected, omitted Plaintiff's diagnosis from the final report.  (*Id.* at 28.)

A few days after the interview, Campbell called Dr. Ritterbush and asked whether she or Plaintiff had recorded the interview or taken notes.  (*Id.* at 15-16, 118-19.)  In response, Dr. Ritterbush stated that she did not have permission to speak with Campbell about Plaintiff.  (*Id*. at 119.)

On December 23, 2017, Plaintiff began a leave of absence.  (Doc. 48-3 at 4-5 ¶ 10.)  Around the same time, Plaintiff applied for short-term disability benefits through Defendant's third-party insurance provider.  (Doc. 48-2 at 56-57.)

Shortly thereafter, Plaintiff set up a meeting with Long and Baca "to turn in necessary items for the program to function" while Plaintiff was on leave.  (Doc. 48-3 at 35.)  On January 5, 2018, at the meeting, Plaintiff asked Long to inform the members of the women's softball team that Plaintiff was on a medical leave of absence in order to "remove[] gossip, rumors and suspicion with the investigation."  (*Id.* at 36.)  Plaintiff also informed Long and Baca that she would be on leave for six to twelve weeks or until her counselor indicated that she could return.  (Doc. 48-3 at 35; Doc. 48-2 at 43-44.)  Long then stated: "I am taking over the program.  When you come back from leave, you will not coach, you will be given something else to do.  I don't want any confusion.  Then whatever happens after that, happens and we can go from there."  (Doc. 48-3 at 35.)  Additionally, Long asked whether Plaintiff wanted the investigation to continue while Plaintiff was on leave, to which Plaintiff responded: "There's only a few weeks left of it, I want this over.  I am cooperating.  I just have to turn in the documentation."  (*Id.* at 36.)[4]

On January 8, 2018, Plaintiff texted Campbell: "[M]y counselor has recommended that while on disability, I focus on my therapy and that my attorney can serve as a point of contact from the school.  Here is her email to cc when you email my [university] email[.]"

___

and, as discussed, the transcript cuts off while Plaintiff and Campbell are still speaking (Doc. 48-2 at 230).

[4]    On January 8, 2018, Heffelfinger emailed Plaintiff: "I am just confirming your conversation with [Long] that while you are out on medical leave you would like the current Title IX investigation and outcomes to continue and be completed as soon as possible."  (Doc. 54-4 at 7.)

(Doc. 54-2 at 34.)  Around the same time, Plaintiff set up automatic reply notifications for her phone and email, which explained that she was "out of the office on medical leave." (Doc. 48-2 at 48; Doc. 48-3 at 8, 39.)

On January 24, 2018, Ekstrand, Plaintiff's then-attorney, emailed Defendant's general counsel, Charlie Sevastos, notifying him that she was representing Plaintiff and asking to "set a time to talk about the investigation that is currently going on."  (Doc. 54-4 at 156.)  Sevastos and Ekstrand met telephonically on January 25, 2018.  (*Id.* at 155-56.)

On January 30, 2018, Sevastos emailed Ekstrand, stating:

> When we spoke last Thursday I got the impression [Plaintiff] was one phone call, or even one mention of [Defendant], away from having to be hospitalized because her "PTSD" as you described it was so severe.  I've learned since that she is very actively calling employees and encouraging them, I guess with your approval or at your direction, to call you and get students to call you.

> We will consider this new information as we move forward with decisions on her status.  In the meantime I have done what I said I would do at your request based on your statements about her condition.

(*Id.* at 155.)

That same day, Ekstrand responded in relevant part as follows: "As I said to you on the phone, I generally respect the integrity of a school's process of looking into allegations. I am losing both respect for and patience with this current process for several reasons, one of which is the inaccuracies being reported to you, as well as the tremendous stress it is unnecessarily inflicting on my client.  I have attached the latest version of '[Plaintiff's] statement' that [Plaintiff] was asked to review and amend (comments in the margins). [Plaintiff] sent this to Deborah Campbell on January 26th."  (*Id.* at 154-55.)

On February 6, 2018, Defendant paused the Title IX investigation.  (Doc. 48-2 at 78-79; Doc. 48-3 at 10.)  Frost emailed the "reporting parties," stating in relevant part: "The investigation is on hold until further notice for administrative reasons not related to the investigation.  I expect it will resume soon.  I will keep you updated."  (*Id.*)  Plaintiff was not notified about the pause.  (Doc. 54-2 at 6 ¶ 57.  *See also* Doc. 48-3 at 16-17 [in a letter dated February 27, 2018, Plaintiff described the investigation as "current and still

ongoing"].)

On February 19, 2018, Defendant's third-party provider denied Plaintiff's request for short-term disability benefits.  (Doc. 48-3 at 12-14.)

On February 27, 2018, Plaintiff appealed the denial.  (Doc. 48-3 at 16-18.)  In her appeal letter, Plaintiff described various ways in which the Title IX investigation was affecting her ability to work.  (*Id.* at 17-18.)  Defendant approved Plaintiff's use of disability pool leave and personal leave (both of which were forms of paid leave) while her appeal was pending.  (Doc. 48-3 at 24-25; Doc. 48-2 at 74-76.)

Meanwhile, on February 23, 2018, Ekstrand again emailed Sevastos, "sharing areas where [she] [saw] a factual basis for legal action" and noting: "My hope is that by recognizing these areas of exposure, we can work towards a settlement that would involve, among other things, monetary relief in exchange for a waiver of claims."  (Doc. 54-4 at 153.)  The "areas of exposure" included violations of Title IX and Title VII.  (*Id.*)

Around the same time, Plaintiff "saw through Facebook that . . . Campbell had 'liked' two of the reporting parties' pictures in an . . . softball album on Facebook.  Those were the only two photos she liked in the whole album."  (*Id.* at 7 ¶ 58.  *See also id.* at 26-27.)  This "upset" Plaintiff because "it seemed like bias in favor of the reporting parties."  (*Id.* at 7 ¶ 59.)

On March 23, 2018, Defendant's third-party provider approved Plaintiff's short-term disability claim.  (Doc. 48-3 at 29-31.)  As a result, Plaintiff received 26 workweeks of short-term disability benefits (*i.e.*, paid leave), retroactive to January 6, 2018.  (*Id.* at 29.)[5]

On May 11, 2018, Plaintiff "learned via text message and screenshot that [Defendant] publicly posted [her] Head Coach position" on a job-search site.  (Doc. 54-2 at 7 ¶ 61.  *See also* Doc. 54-4 at 166.)

On June 28, 2018, Heffelfinger emailed Plaintiff, stating in relevant part: "Hope you

---

[5]      The plan had a waiting period of 14 days; thus, the January 6, 2018 date assumed that Plaintiff's disability began on December 23, 2017.  (Doc. 48-3 at 29.)

1   are doing well, I wanted to provide you with update.  Your short term disability will end
2   on July 4, 2018 at which time your employment with [Defendant] will also end."  (Doc.
3   48-3 at 33.)  Plaintiff avows that, "[a]s shown on the email, there was no option presented
4   for [Plaintiff] to return to work—simply that [her] employment would end at the same time
5   as [her] short term disability, July 4, 2018."  (Doc. 54-2 at 7 ¶ 62.)

6       Following Plaintiff's termination on July 4, 2018, Defendant did not complete the
7   Title IX investigation.  (Doc. 54-4 at 86.)

8   II.   Procedural History

9       On December 18, 2020, Plaintiff initiated this action.  (Doc. 1.)

10      On January 12, 2021, Plaintiff filed her operative pleading, the First Amended
11  Complaint ("FAC"), asserting claims under the FMLA, Title VII, and the ADA.  (Doc. 9.)
12  Specifically, Count One alleges that "Defendant interfered with Plaintiff's FMLA rights"
13  in several ways (*id.* ¶¶ 46-52); Count Two alleges that Defendant violated Title VII by
14  "engaging in direct harassment and disparate treatment of Plaintiff because of her sex" and
15  by "creating and fostering a pervasive hostile work environment that altered the terms and
16  conditions of Plaintiff's employment and was abusive" (*id.* ¶¶ 53-65); Count Three alleges
17  that Defendant violated the ADA by "engag[ing] in direct discrimination and harassment
18  against Plaintiff, as well as treating her disparately from other non-disabled workers" (*id.*
19  ¶¶ 66-77); Count Four alleges that Defendant violated Title VII by "retaliat[ing] against
20  Plaintiff for engaging in protected activity" (*id.* ¶¶ 78-84); and Count Five alleges that
21  Defendant violated the ADA by "retaliat[ing] against Plaintiff for engaging in protected
22  activity" (*id.* ¶¶ 85-91).

23      On October 14, 2022, after the close of fact discovery (Doc. 44), Defendant filed a
24  motion for partial summary judgment as to Counts Two through Five.  (Doc. 48.)  The
25  motion is now fully briefed.  (Docs. 54, 57.)

26      On July 24, 2023, the Court issued a tentative ruling.  (Doc. 59.)

27      On August 8, 2023, the Court heard oral argument.  (Doc. 63.)

28      …

- 11 -

**DISCUSSION**

I.  <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal

1    citations omitted).  At the same time, "[t]he evidence of the non-movant is to be believed,

2    and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  "[I]n ruling on a

3    motion for summary judgment, the judge must view the evidence presented through the

4    prism of the substantive evidentiary burden."  *Id.* at 254.  Thus, "the trial judge's summary

5    judgment inquiry as to whether a genuine issue exists will be whether the evidence

6    presented is such that a jury applying that evidentiary standard could reasonably find for

7    either the plaintiff or the defendant."  *Id.* at 255.

8    II.    Analysis

9          A.    **Count Two**

10         In Count Two, Plaintiff alleges that Defendant violated Title VII by subjecting her

11   to disparate treatment on the basis of sex and also by subjecting her to sexual harassment.

12   (Doc. 9 ¶¶ 53-65.)  However, in her summary judgment briefing, Plaintiff concedes that,

13   "[b]ased on the summary judgment record, it is likely that the events that [Plaintiff]

14   reported . . . are not likely to create an environment 'pervasive' enough for her Title VII

15   sexual harassment claim to survive." (Doc. 54 at 12.)  Thus, summary judgment is granted

16   in Defendant's favor as to the sexual harassment component of Count Two.

17         As for the disparate treatment component of Count Two, Title VII makes it unlawful

18   for an employer "to discriminate against any individual with respect to [her] compensation,

19   terms, conditions, or privileges of employment, because of such individual's . . . sex."  42

20   U.S.C. § 2000e-2(a)(1).  "To establish disparate treatment under Title VII, a plaintiff must

21   offer evidence that gives rise to an inference of unlawful discrimination, either through the

22   framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial

23   evidence of discriminatory intent."  *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir.

24   2021) (internal quotation marks omitted).  Here, the parties agree that Plaintiff's claim is

25   governed by the *McDonnell Douglas* framework.  (Doc. 48 at 12-13; Doc. 54 at 9.)  To

26   establish a prima facie case of disparate treatment under that framework, a plaintiff must

27   show that "(1) the plaintiff belongs to a protected class, (2) [she] was performing according

28   to [her] employer's legitimate expectations, (3) [she] suffered an adverse employment

action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017). "[T]he requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023) (cleaned up).

In its motion, Defendant contends that Plaintiff cannot establish the second and fourth elements of the *McDonnell Douglas* test. (Doc. 48 at 12-13.) More specifically, Defendant argues that (1) Plaintiff was not qualified for the position because, "by her own admission," her disability rendered her "unable to coach"; and (2) there is no evidence that similarly-situated male coaches were treated differently than Plaintiff. (*Id.*) In response, Plaintiff argues that she "can meet the prima facie case" because "she (as a woman—a protected class) was qualified for the position (she got a good review in 2017), was held to a different standard than male coaches as acknowledged by a male coach and Liz Frost herself. Plus she was exposed to a bogus Title IX investigation so poorly conducted that the male coach accused of actual sexual harassment got a better deal than she did. And she was denied a raise, investigated for nothing that would qualify for Title IX, and terminated—which would all count as adverse actions in the 'expansive' Ninth Circuit." (Doc. 54 at 9, citations omitted.) As discussed in more detail below, the Court construes this passage as arguing that Plaintiff was subjected to three different categories of disparate treatment for purposes of the fourth *McDonnell Douglas* element: (1) being subjected to the various criticisms that Blake directed toward her, which culminated in her being placed on a PIP; (2) "being exposed to a bogus Title IX investigation" in which none of the underlying allegations "would qualify for Title IX"; and (3) receiving a worse "deal" than a "male coach accused of actual sexual harassment." (*Id.*) Additionally, Plaintiff contends that she suffered various adverse actions as a result of this disparate treatment (*e.g.*, missing out on a pay raise due to the PIP, being exposed to an unwarranted Title IX investigation, and ultimately being terminated) and that Defendant cannot avoid liability by claiming that

it was acting pursuant to legitimate, non-discriminatory reasons because a reasonable juror could deem those reasons pretextual.  (*Id.* at 9-12.)  In reply, Defendant reiterates its contention that Plaintiff cannot meet her prima facie case for liability because she was unqualified and was not treated less favorably than male coaches.  (Doc. 57 at 7-9.) Defendant also contends that, to the extent Plaintiff's claim turns on the decision to "halt[] the Title IX investigation during Plaintiff's mental health-related leave and never complete[] it," this claim fails because Defendant "could no longer take any action with respect to Plaintiff" once her employment ended.  (*Id.* at 7-8.)  Finally, Defendant contends that, to the extent Plaintiff seeks to prove the existence of less-favorable treatment by relying on the portions of her declaration in which she recounts gender-stereotyped comments that Campbell purportedly made during the final portion of the formal Title IX interview (which were not captured on the audio recording), the Court should invoke the "sham affidavit" rule to disregard those assertions.  (*Id.* at 8-9.)

The Court begins where Defendant begins, with the second *McDonnell Douglas* element.  That element addresses whether Plaintiff was "qualified for the position."  As noted, Defendant's argument is that Plaintiff cannot satisfy this element because, by "her own admission," she was "unable to coach" following the onset of her disability in December 2017.  (Doc. 48 at 13-14.  *See also* Doc. 57 at 7.)  An initial difficulty with this argument is that Plaintiff's theory of liability is that she was subjected to several different episodes of disparate treatment, which resulted in several different adverse employment actions, over a period of time.  (Doc. 54 at 9.)  As noted, Plaintiff clarifies that her Title VII discrimination claim is based in part on Blake's conduct toward her before and up to May 2017, which led to a PIP that caused her to miss out on a pay raise (one adverse employment action); is also based on the fact that Defendant subjected her to a meritless Title IX investigation, which began on November 6, 2017 and constituted another adverse employment action,[6] despite the absence of any underlying allegations that might implicate

---

[6]     The Court notes that the Ninth Circuit has suggested that a school's "mere" decision to "investigate[] allegations of misconduct against [an employee]—with no resulting change to the conditions of her employment—is not an adverse employment action for purposes of [a Title VII] disparate treatment claim."  *Campbell v. Haw. Dep't of Educ.*,

1    Title IX; and is also based on the unfair treatment she received during the Title IX

2    investigation, which culminated in the ultimate adverse employment action of termination

3    in July 2018.  (*Id.*)   Even assuming, as Defendant asserts, that Plaintiff ceased being

4    "qualified" for her position at some point in December 2017, much if not all of the alleged

5    disparate treatment, and many of the alleged adverse actions, occurred before that date.

6    Plaintiff has proffered evidence, which Defendant does not appear to dispute (and which

7    could, at any rate, be credited by a reasonable juror), that she was qualified for her position

8    (at a minimum) before December 2017.[7]

9           An additional difficulty with Defendant's argument is that Plaintiff has proffered

10   evidence from which a reasonable factfinder could find that the alleged disparate treatment

11   triggered her disability.  (Doc. 54-4 at 168-69 [Dr. Ritterbush, describing the investigation

12   as a "trauma episode"]; Doc. 48-3 at 17-18 [Plaintiff's letter appealing the denial of short-

13   term disability benefits, describing the various ways in which the Title IX investigation

14   was affecting her ability to work].)  Defendant has not cited, and the Court has not been

15   able to identify through its own research, any case suggesting that a Title VII defendant

16   can rely on such a chain of events to establish the absence of qualification under the second

17   prong of *McDonnell Douglas*.  This may be an issue that would benefit from further

18   briefing at later stages of the case, but for now Defendant has not established an entitlement

19   to summary judgment on Plaintiff's Title VII discrimination claim due to the absence of

20   qualification.  *See generally Fragante v. City and Cnty. of Honolulu*, 888 F.2d 591, 595

21   (9th Cir. 1989) ("Title VII's nature and purpose require that the *McDonnell Douglas* test

22

23   _____

24   892 F.3d 1005, 1013 (9th Cir. 2018).  However, Defendant does not move for summary
     judgment on this ground—as noted, Defendant limits its arguments to the second and
     fourth elements of the *McDonnell Douglas* test.  Additionally, as discussed in other

25   portions of this order, the summary judgment analysis as to Count Two ultimately does not
     turn on whether the initiation of the Title IX investigation qualifies as an adverse action.

26   [7]     Plaintiff's overall performance rating of "Meets Expectations" in May 2017 (Doc.

27   54-2 at 9) could lead a reasonable factfinder to conclude that Plaintiff was qualified for the
     position before December 2017.  Defendant does not argue otherwise in its motion
     papers—as noted, Defendant focuses all of its argument on whether Plaintiff remained

28   qualified after her admission of disability in December 2017.

be flexible.") (citation omitted).[8]

Turning to the fourth *McDonnell Douglas* element, Plaintiff must show that "similarly situated individuals outside [her] protected class were treated more favorably, or [that] other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). As noted, Plaintiff identifies three ways in which she was treated less favorably than male coaches: (1) Blake's conduct toward her, which culminated in a PIP; (2) being subjected to an unfounded Title IX investigation; and (3) receiving a worse "deal" than a "male coach accused of actual sexual harassment." (Doc. 54 at 9.)

As for the first category, Plaintiff elaborates that "Blake treat[ed] her differently than male coaches" by acting aggressively and frequently criticizing her coaching decisions. (Doc. 54 at 4, 9. *See also* Doc. 54-2 at 20 [Plaintiff's notes following May 2017 meeting: "Blake made several comments of how to coach baseball/softball, what 'he would do' and what I do wrong in terms of strategy and skill. . . . [H]e led a lengthy conversation with 'If I were to retire, I could coach baseball or softball . . . ' going on and on about his skillset for both sports, yet criticizing [me] multiple times . . . . If I were a male, he would have talked to me differently. Because I was a female coach, significantly younger in age than him, I was treated as an 'unskilled' softball coach and criticized."].) Plaintiff also presents evidence that, in April 2017, Blake made "explicit lewd comments" to her about a photograph of a male student's genitals. (Doc. 54 at 4; Doc. 54-4 at 148.) On May 1, 2017, Plaintiff complained about Blake's behavior to Heffelfinger, who was unhelpful. (Doc. 54-2 at 20; Doc. 54-4 at 9-10.) On May 23, 2017, Blake placed Plaintiff on a PIP. (Doc. 54-2 at 3 ¶ 9; *id.* at 15-16.) Shortly thereafter, Plaintiff spoke with two colleagues, Frost and Pearce, both of whom expressed their belief that Blake's and HR's actions (or lack thereof) were discriminatory. (Doc. 54-4 at 28, 151.)

---

[8]      The Court also notes that, as discussed in Part II.B below, Plaintiff's inability to work while on disability leave does not necessarily mean she is "unqualified" for ADA purposes. Of course, the concept of qualification under Title VII may be different than the concept of qualification under the ADA, but this is a further reason to conclude that summary judgment is unwarranted here.

Defendant does not dispute any of Plaintiff's specific assertions about Blake's and HR's actions (or lack thereof). Instead, Defendant contends that other record evidence "establishe[s] that male and female . . . coaches had the same or similar experiences." (Doc. 48 at 9-11; Doc. 57 at 7-8.) Specifically, Defendant characterizes Plaintiff's disparate treatment claim based on the PIP as arising from three instances of alleged discrimination: (1) "Blake g[iving] an in-person performance evaluation to another female coach (not Plaintiff), rather than leaving the evaluation on the coach's desk"; (2) "Blake g[iving] Plaintiff a vague performance improvement plan"; and (3) "Blake [being] verbally aggressive with her after her losing season." (Doc. 48 at 12-13.) Based on this understanding of Plaintiff's claim, Defendant concludes that Plaintiff's deposition testimony—in which she admitted that "Blake gave an in-person performance evaluation to a male coach, rather than leaving the evaluation on that coach's desk," "gave a similarly vague performance improvement plan to a male coach," and "was verbally aggressive with a male coach," and further admitted that "male and female ERAU coaches had the same or similar experiences" with Blake—"destroy[s] her sex discrimination claim." (*Id.* at 9-13; Doc. 57 at 7-8.)

Defendant misunderstands Plaintiff's disparate treatment claim based on Blake's conduct and the PIP. In her response brief, Plaintiff emphasizes Blake's frequent and aggressive criticisms of her coaching decisions, his lewd comment in April 2017, HR's lackluster response to her complaints about Blake, and the fact that, soon after she spoke with HR, Blake placed her on a PIP while insinuating that he had spoken with HR and further criticizing her coaching abilities. (Doc. 54 at 4-5. *See also* Doc. 54-2 at 19-20; Doc. 54-4 at 26-29, 151.) These allegations are not undermined by Plaintiff's admissions that Blake gave male coaches in-person performance evaluations and gave a "vague" PIP to a male coach. Likewise, Plaintiff's testimony that Blake acted aggressively toward a male coach and that coaches of both sexes were frustrated with Blake's behavior does not "destroy" her prima facie case. The fact that Blake was generally a difficult supervisor is not inconsistent with a finding that his behavior toward Plaintiff, specifically, was

motivated by discriminatory animus.

Despite this, the Court stated in the tentative ruling issued before oral argument that Plaintiff could not premise her Title VII disparate treatment claim on Blake's conduct and the PIP because she had not identified any "employees outside her . . . sex who were similarly situated to her 'in all material respects' but who were given preferential treatment." (Doc. 59 at 20-21.) Upon reflection, and with the benefit of oral argument, the Court concludes that this determination was mistaken. Although the most common way of satisfying the fourth prong of the *McDonnell Douglas* test is to identify a similarly situated employee who was treated more favorably, this is not the only way to do so—as noted in earlier portions of this order, a plaintiff may also identify "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga,* 847 F.3d at 691; *Peterson,* 358 F.3d at 603. During oral argument, Plaintiff emphasized that the "other circumstances" included that Defendant's Title IX coordinator, Frost, "told" Plaintiff that that "Ted[ Blake]'s treatment . . . was discrimination" and advised Plaintiff about how to report the discrimination to federal civil rights investigators. (Doc. 54-4 at 28.) Although Frost's statement is of course not a conclusive admission that Plaintiff was the victim of sex-based discrimination, "the requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Opara,* 57 F.4th at 722. Given this principle, Plaintiff has done enough to satisfy the fourth prong.

Next are Plaintiff's claims of disparate treatment related to the Title IX investigation. As noted, the Court construes Plaintiff's brief as arguing that the disparate treatment took two discrete (if related) forms: first, she should not have been subjected to a Title IX investigation at all, because the underlying allegations against her had nothing to do with sex-based discrimination (which is the only form of discrimination that Title IX seeks to combat); and second, in any event, she was treated more shabbily during the Title IX investigation than a similarly situated male coach who was also the subject of a Title IX investigation. (Doc. 54 at 9.)

The former theory requires little discussion.  Even assuming, as Plaintiff contends, that Defendant lacked an adequate foundation for initiating a Title IX investigation of her (because the underlying allegations did not sound in sex discrimination), Plaintiff has not identified any evidence that a male coach faced with similar allegations was *not* subjected to a Title IX investigation or any other circumstances that support an inference of discrimination.[9]  Without such evidence, Plaintiff cannot satisfy the fourth element of her prima facie case under *McDonnell Douglas*.[10]

This leaves Plaintiff's latter theory about the Title IX investigation.  Plaintiff asserts that the investigation was conducted in a biased manner because, as a female coach, she "was expected to coach [her] players in a nurturing way, be more motherly and not expect high standards for their fitness levels, for their performance, and not treat them as competitive athletes."  (Doc. 48-2 at 11.)  As evidence of such expectations, Plaintiff asserts that, during her Title IX interview, Campbell "told Plaintiff that she should be more 'nurturing' of her athletes and 'make it fun'; and take their suggestions for runnings [sic] drills and practices."  (Doc. 54 at 7.)[11]  According to Plaintiff, because of these gendered expectations, Defendant not only opened a "bogus Title IX investigation" into players' complaints about Plaintiff but conducted the investigation "poorly" in various ways (some of which violated Defendant's Title IX policies), including by pausing and never completing the investigation.  (Doc. 54 at 1-3, 6-10.)

Plaintiff contends that these features of her Title IX investigation implicate the

---

[9]     During oral argument, Plaintiff agreed that "there's no evidence in the record of players at the university complaining to the administration about this type of behavior [by male coaches] and those complaints did not result in a Title IX investigation."

[10]    The Court also notes that Plaintiff does not explain how Defendant's decision to conduct a Title IX investigation (as opposed to a different sort of investigation) was discriminatory or unfavorable to her.

[11]    As noted, Defendant challenges Plaintiff's assertion that Campbell told Plaintiff to be "nurturing" during an unrecorded portion of the Title IX interview.  (Doc. 57 at 8-9.)  Because this fact is not material to the issues discussed in this order—even assuming that Campbell never made this statement, Defendant's challenge to Plaintiff's prima facie case of discrimination based on the Title IX investigation would fail—the Court declines to address Defendant's contention that the Court should disregard paragraphs 41 and 42 of Plaintiff's declaration under the sham affidavit doctrine.

fourth *McDonnell Douglas* element because "the male coach accused of actual sexual harassment got a better deal than she did." (Doc. 54 at 9.) For context, in 2013, three students lodged complaints against the then-head coach of the women's soccer team (a male), which Defendant investigated under Title IX. (Doc. 48-3 at 43.) First, in July 2013, a student alleged that the male coach had made sexually explicit jokes and engaged in "unwelcomed" physical interactions. (*Id.*) After determining that his behavior was inappropriate, Defendant limited the male coach's ability to hire student-athletes, required him to have an assistant coach present at all practices, required that he attend a Title IX compliance training, and placed a letter in his HR file. (*Id.*)[12] Second, in September 2013, a student again complained about this coach's behavior, asserting that he made sexual comments (including "that's what she sa[i]d" jokes), touched players' backs and arms, and asked a player when she was coming over to his house. (*Id.*) After determining that the complained-of incidents were the same as those that gave rise to the July complaint, Defendant documented the allegations but did not take further action. (*Id.*)[13] Finally, in October 2013, a student complained that the coach had retaliated against her for a previous complaint by limiting her playing time. (*Id.*) Defendant found no evidence supporting this allegation. (*Id.*)

Plaintiff argues that the male coach was treated more favorably than she was treated because he "got a finished Title IX investigation[] and kept his job." (Doc. 54 at 4,

---

[12] Based on the same conduct, the complainant's mother filed a complaint with OCR, alleging that Defendant "failed to provide a prompt and equitable resolution to her daughter's complaint of sexual harassment by her . . . coach." (Doc. 54-4 at 158.) Defendant "indicated its desire to voluntarily enter into an agreement to resolve the allegations raised" and thus, in 2014, entered into a "Resolution Agreement" under which Defendant agreed to take certain actions to ensure compliance with Title IX and its implementing regulation. (*Id.* at 158-59. *See also id.* at 160-64 [Resolution Agreement].) Plaintiff emphasizes that, in the Resolution Agreement, Defendant agreed that its Title IX procedures would include "[a]pplication of the grievance procedures to complaints alleging sex discrimination, including sexual violence, carried out by employees, students, or third parties;" "[d]esignated and reasonably prompt time frames for the major stages of the complaint process;" and "[n]otice to the complainant and alleged perpetrator of the outcome of the complaint." (*Id.* at 160.)

[13] The notes from this incident explain that the September complainant was unaware of the remedial actions taken in response to the July complaint and, once she was made aware of those actions, did not seek further redress. (Doc. 48-3 at 43.)

emphasis omitted.)  Defendant, in turn, does not dispute that the male coach investigated in 2013 was similarly situated to Plaintiff[14] and instead argues that Plaintiff's evidence is insufficient because it "treated Plaintiff, a female coach, the same or even more favorably than the male coach," explaining that it "halted the 2017 Title IX investigation during Plaintiff's mental health-related leave and never completed it because, after Plaintiff's employment ended, [Defendant] could no longer take any action with respect to Plaintiff." (Doc. 57 at 7-8, emphasis omitted.)

To the extent this argument is intended to challenge the sufficiency of Plaintiff's evidence in relation to the fourth *McDonnell Douglas* element—which, as noted, is the only ground on which Defendant moved for summary judgment—it is unavailing.  Again, the fourth element only asks whether a comparator was treated "more favorably," not whether the employer had a legitimate, non-discriminatory reason for taking adverse action against the plaintiff (which is addressed during later stages of the analysis).  Here, Plaintiff has provided ample evidence that Defendant's decision to pause and never complete the investigation was unfavorable to her.  Among other things, Plaintiff has submitted evidence that the open investigation contributed to her inability to work by exacerbating her PTSD (Doc. 54-4 at 168-69 [Dr. Ritterbush]; Doc. 48-3 at 17-18 [Plaintiff's letter to insurance company]) and that, because of this, she repeatedly advocated for the investigation to continue while she was on medical leave (*see, e.g.*, Doc. 48-2 at 200; Doc. 54-4 at 7).  Additionally, Defendant's Title IX policy states that if an employee's employment ends while a "pending violation" is "in process," Defendant's "responses to any future inquiries regarding employment references for that individual will reflect a pending violation." (Doc. 54-3 at 24-25.)  Thus, a genuine dispute of material fact exists as to whether Defendant treated Plaintiff less favorably than the male coach investigated in 2013.[15]

---

[14]   During oral argument, Defendant sought to argue that "this male wasn't entirely similarly situated in all . . . relevant aspects" because he was not "dealing with similar PTSD mental health issues" and did not take leave or go on short-term disability.  This argument is forfeited because it was not squarely and distinctly raised in Defendant's motion papers.

[15]   Accordingly, at least for purposes of Plaintiff's prima facie case, the Court need not address Plaintiff's alternative argument that her Title IX investigation was marked by

This determination means that Defendant's motion for summary judgment as to the Title VII disparate treatment claim must be denied.  Although Defendant's reply brief includes a passage addressing whether Defendant had legitimate, non-discriminatory reasons for its challenged conduct, and Plaintiff's response brief also includes a broad-ranging discussion of the overall sufficiency of her evidence, the only argument fairly raised in Defendant's motion is that Plaintiff cannot satisfy the second and fourth elements of the *McDonnell Douglas* test.  (Doc. 48 at 12-13.)  She can, for the reasons stated above.  Thus, although the Court harbors some doubt as to ultimate viability of Plaintiff's Title VII disparate treatment claim, summary judgment is not warranted on this record.  The general rule is that "[t]he district court need not consider arguments raised for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), and this rule applies with particular force in the summary-judgment context.  *See, e.g.*, Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 166 (2020) ("Moving parties are expected to put all of their arguments . . . in the opening brief . . . [and] aren't supposed to include new arguments . . . in their reply briefs."); *Fried v. Surrey Vacation Resorts, Inc.*, 2010 WL 2330272, *1 (W.D. Wisc. 2010) ("[T]he movant in a summary judgment motion cannot introduce new . . . arguments in its reply materials.").  *Cf.* Fed. R. Civ. P. 56(f)(2) (district court may grant summary judgment "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond").

## B.   **Count Three**

In Count Three, Plaintiff alleges that Defendant violated the ADA by discriminating against her on the basis of her disability and by engaging in disability-based harassment. (Doc. 9 ¶¶ 66-77.)

In its motion, Defendant argues that Count Three fails because "Plaintiff was not, and cannot show that she was, a 'qualified individual'" protected by the ADA.  (Doc. 48 at 14.)  Defendant also contends that "Plaintiff cannot show that [Defendant] discriminated against her, or that any adverse action would not have occurred but for her disability" and

procedural irregularities that give rise to an inference of discrimination.  (Doc. 54 at 3-4.)

"has not set forth any evidence that she was harassed because of her disability." (*Id.* at 13-16.)

### 1.    Qualified Individual

Title I of the ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[16] "Qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) (citation omitted).

The relevant facts bearing on whether Plaintiff was a "qualified individual" are as follows. Plaintiff began working from home in November or December 2017. (Doc. 48-2 at 22, 112; Doc. 54-2 at 4-5 ¶¶ 29-31.) During her deposition, Defendant's counsel asked Plaintiff: "Do you believe as of December 13, 2017, that you were able to coach your students . . . , or do you believe that you were unable to coach as of that date?" (Doc. 48-2 at 40.) Plaintiff responded: "On that date, I was not able to coach them, no." (*Id.*) On December 15, 2017, Plaintiff emailed Long, indicating that she planned to "take some [paid time off] as well as the holiday to take a break" "[u]pon finishing [her] documentation [for the Title IX investigation] and meeting with [Campbell] next week." (*Id.* at 112 ["I am hoping this will be sufficient in working with my counselor to get back to a good place."].) Consistent with that email, on December 23, 2017, Plaintiff began a leave of absence. (Doc. 48-3 at 4-5 ¶ 10.) Around the same time, Plaintiff applied for short-term disability benefits through Defendant's third-party insurance provider. (Doc. 48-2 at 56-57.) On

---

[16]    Defendant does not dispute that Plaintiff's PTSD was a disability within the meaning of the ADA.

January 5, 2018, Plaintiff informed Long that Plaintiff would be on leave for six to twelve weeks or until her counselor indicated that she could return.  (Doc. 48-2 at 43-44; Doc. 48-3 at 35.)  On February 19, 2018, Defendant's third-party provider denied Plaintiff's request for short-term disability benefits.  (Doc. 48-3 at 12-14.)  On February 27, 2018, Plaintiff appealed the denial; in her appeal letter, Plaintiff described various ways in which her PTSD was inhibiting her ability to work.  (*Id.* at 16-18.)[17]  On May 11, 2018, Plaintiff learned Defendant had "publicly posted [her] Head Coach position" online.  (Doc. 54-2 at 7 ¶ 61.  *See also* Doc. 54-4 at 166.)  On June 28, 2018, Heffelfinger emailed Plaintiff the following: "Your short term disability will end on July 4, 2018 at which time your employment with [Defendant] will also end."  (Doc. 48-3 at 33.)[18]  Finally, Plaintiff testified during her deposition that, as of July 3, 2018, she "was not in a position to coach." (Doc. 48-2 at 61-62.)

Based on these facts, Defendant contends that Plaintiff was not a "qualified individual" under the ADA because she was "unable to perform the essential functions of her Women's Softball Coach position, beginning at least as early as December 13, 2017, nearly seven months before her employment with [Defendant] ended, and through at least February 2019, seven months after her employment with [Defendant] ended."  (Doc. 48 at 14, emphasis omitted.)  In response, Plaintiff argues that she was a "qualified individual" because she was able to perform the essential functions of her job *with* a reasonable accommodation—namely, additional (but unpaid) medical leave, presumably while Defendant resumed and finished the Title IX investigation and Plaintiff continued to seek medical treatment.  (Doc. 54 at 15-16.  *See, e.g.*, Doc. 48-3 at 16 [Plaintiff's appeal letter: "Dr. Ritterbush predicted a treatment timeline of 12 months after trauma has ceased."].)  In a related vein, Plaintiff argues that Defendant was required to engage in an interactive

---

[17]    Additionally, during her deposition, Plaintiff testified that she was "not . . . mentally able to coach" as of February 27, 2018.  (Doc. 48-2 at 59.)

[18]    Although the parties disagree about whether Defendant's decision to terminate Plaintiff when her leave expired was the result of an "automatic" policy or made on a case-by-case basis (Doc. 54 at 15; Doc. 57 at 5-6), this distinction is immaterial to the analysis here.

process to determine if accommodation was possible but instead terminated her without offering any alternatives.  (Doc. 54 at 15.)  In reply, Defendant reiterates that "the record, including Plaintiff's sworn testimony, conclusively establish that Plaintiff could not coach at least as early as December 13, 2017 and at least through February 2019" and further contends that "Plaintiff should be judicially estopped from taking an inconsistent position in this lawsuit regarding her ability to coach, when she made prior certifications of total disability to obtain disability insurance benefits."  (Doc. 57 at 3.)

Plaintiff's inability to perform her coaching duties while on medical leave does not automatically render her unqualified for purposes of the ADA.  "The ADA requires that [Plaintiff] be able to perform the essential functions of her job 'with or without reasonable accommodation.'"  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (quoting 42 U.S.C. § 12111(8)).  As Plaintiff correctly notes (Doc. 54 at 15-16), "[u]npaid medical leave may be a reasonable accommodation under the ADA."  *Nunes*, 164 F.3d at 1247.  *See also id.* ("Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer.").  If unpaid medical leave was a reasonable accommodation, "then [Plaintiff's] inability to work during the leave period would not automatically render her unqualified." *Id.*

Plaintiff has "the burden of showing the existence of a reasonable accommodation that would have enabled [her] to perform the essential functions of an available job."  *Dark v. Curry Cty.*, 451 F.3d 1078, 1088 (9th Cir. 2006).  Generally, "[d]etermining whether a proposed accommodation . . . is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry."  *Nunes*, 164 F.3d at 1247.  Thus, "[t]o avoid summary judgment," Plaintiff "need only show that an accommodation *seems reasonable on its face*, i.e., ordinarily or in the run of cases."  *Dark*, 451 F.3d at 1088 (citation and internal quotation marks omitted).  *See also Snapp v. United Transp. Union*, 889 F.3d 1088, 1101 (9th Cir. 2018) ("This burden of merely identifying a

possible accommodation is a simple burden of production.").[19]  "Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *US Airways v. Barnett*, 535 U.S. 391, 402 (2002).  Additionally, the employer bears "an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation that would permit [the employee] to retain [her] employment." *Dark*, 451 F.3d at 1088.  If the employer "did not engage in any such process, summary judgment is available only if a reasonable finder of fact *must* conclude that 'there would in any event have been no reasonable accommodation available.'"  *Id.* (citation omitted).

As for whether the accommodation now identified by Plaintiff—unpaid medical leave until she was able to return to work—was "reasonable on its face" and thus sufficient to satisfy Plaintiff's initial burden of production, Defendant asserted during oral argument that such an accommodation would be facially unreasonable because being the head coach of a college sports team is a year-round job with year-round recruiting and other responsibilities.  Although this argument has intuitive appeal, it is insufficiently developed, at least on the current record, to compel a ruling in Defendant's favor.  At bottom, Defendant's argument is really an argument about undue hardship—that is, that requiring the head coach position to remain in flux for a year or more would degrade the quality of Defendant's softball team and the experience of Defendant's student-athletes—but Defendant did not raise any undue-burden arguments in its summary judgment briefing.  Additionally, the record is undeveloped as to the specific recruiting and other responsibilities associated with Plaintiff's position as a coach at a Division III school.  *Cf. Kachur v. NAV-LVH, LLC*, 817 F. App'x 359, 361 (9th Cir. 2020) ("We have never

---

[19]  During oral argument, Defendant asserted that because the interactive process is supposed to be "a two-way street" yet Plaintiff never specifically requested a term of unpaid leave as an accommodation for her disability, she should be precluded from advancing such a theory here.  This argument is unavailing.  Under Ninth Circuit law, "[t]he range of possible reasonable accommodations, for purposes of establishing liability for failure to accommodate, can extend beyond those proposed."  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 (9th Cir. 2000) (en banc) (emphasis added), *overruled on other grounds in US Airways v. Barnett*, 535 U.S. 391 (2002).

recognized a per se rule that extended leave could never constitute a reasonable accommodation.   In fact, we have consistently held that whether a proposed accommodation is reasonable requires a fact-specific, individualized inquiry.") (cleaned up); *Shim v. United Air Lines, Inc.*, 2012 WL 6742529, *9 (D. Haw. 2012) (determining the reasonableness of prolonged disability leave is "tricky" and often involves "difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes") (citation omitted).[20]

In a related vein, Defendant argues that unpaid medical leave would not have been effective given that Plaintiff remained unable to coach "seven months after her employment with [Defendant] ended."  (Doc. 57 at 3.)  However, "the ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation, and an employee only needs to satisfy the minimal requirement that a leave of absence could plausibly have enabled him adequately to perform his job." *Kachur*, 817 F. App'x at 361 (cleaned up).  Here, Plaintiff provides evidence that she was seeking treatment (*i.e.*, counseling from Dr. Ritterbush) and that she had an expected "treatment timeline" of 12 months after the "trauma . . . ceased." (Doc. 48-3 at 16.)  Additionally, the record establishes that Plaintiff attempted to accelerate her recovery timeline by repeatedly advocating for the Title IX investigation to continue while she was on disability leave.  (*See, e.g.*, Doc. 54-4 at 7.)  Thus, genuine issues of material fact exist as to whether additional unpaid leave would have enabled Plaintiff to perform the essential functions of her job—*i.e.*, whether she was a "qualified individual"

---

[20]   This conclusion is also supported by the facts that Plaintiff received an overall "Meets Expectations" performance rating in May 2017 (Doc. 54-2 at 9), Defendant was initially supportive of Plaintiff's decision to take leave (Doc. 48-2 at 22, 114-15), and when she was terminated, Plaintiff had been on medical leave for six months and was participating in therapy to control her symptoms (Doc. 48-3 at 16-18).  In *Nunes*, on similar facts, the Ninth Circuit found that "Nunes ha[d] raised a genuine issue of material fact as to whether her medical leave, projected to extend to November or December 1995, was a reasonable accommodation."   164 F.3d at 1247.  *See also id.* (Nunes was a "good employee," who "went out on medical leave with the blessing of Wal–Mart"; "[t]hroughout the leave period, Nunes submitted doctors' certifications to Wal–Mart indicating that she would be unable to work until November or December 1995" and "[w]hen she was terminated . . . , she had been on medical leave for seven months and was learning stress reduction techniques to control her symptoms").

under the ADA.

As for judicial estoppel, Defendant argues that Plaintiff "cannot, on the one hand, collect or attempt to collect disability benefits by certifying that she was totally disabled and unable to perform any work but, on the other hand, claim that she was a qualified individual entitled to ADA protections." (Doc. 57 at 3-4.)[21] The analysis as to this issue is governed by the framework set forth in *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), under which the Court analyzes (1) whether, as a legal matter, Plaintiff's ADA claim "inherently" conflicts with her claim for short-term disability benefits so as to warrant a "negative presumption" against her ADA claim; (2) if not, whether her disability benefits claim "genuinely" conflicts with her ADA claim "so as to 'negate an essential element of her ADA claim'"; and (3) if a genuine conflict exists, whether Plaintiff has offered "a sufficient explanation for any inconsistency." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 956 (9th Cir. 2013) (citations omitted). *See also Norris v. Sysco Corp.*, 191 F.3d 1043, 1049 (9th Cir. 1999) (noting that, in *Cleveland*, the Supreme Court "emphasized the fact that an ADA claim of ability to work with accommodation does not necessarily clash with a disability claim assertion . . . of inability to do substantial gainful work in the national economy" and, "therefore, rejected the use of judicial estoppel, and declared that ADA cases should be treated like other cases where factual contradictions are alleged to exist") (citations omitted).

As for the first step of the *Cleveland* analysis, Defendant does not argue, nor does the record establish, that an inherent conflict exists between Plaintiff's application for short-term disability benefits and her ADA claim. Defendant's third-party provider defined "Disabled from your Own Occupation" as follows: "[A]s a result of Physical

---

[21] There is a strong argument that this argument is forfeited because Defendant raised it for the first time in its reply. *Zamani*, 491 F.3d at 997. In its motion, Defendant identified the fact that "Plaintiff attested to her inability to perform her coaching duties in order to gain [the third-party provider's] approval of her short-term disability benefits" as evidence that she was unable to coach during that time but did not argue that her statements in her disability benefits appeal had any specific legal effect (such as judicial estoppel) on her ability to argue that she was a qualified individual for purposes of an ADA claim. (Doc. 48 at 14.)

Disease, Injury, Pregnancy or Mental Disorder . . . You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and . . . You suffer a loss of at least 20% in your Predisability Earnings when working in your Own Occupation." (Doc. 48-3 at 12. *See also id.* ["Own Occupation means the job you are regularly performing for your Employer when Disability begins. Material Duties means the usual duties you perform in your regular job with your Employer, that cannot be reasonably modified or omitted."].) This language does not establish that the third-party provider's definition of "Disabled" considered all reasonable accommodations, including the possibility of temporary unpaid medical leave. Thus, Plaintiff's request for and receipt of short-term disability leave was not an admission of an inability to work with or without reasonable accommodations. *See also Johnson v. State, Or. Dep't of Hum. Res., Rehab. Div.*, 141 F.3d 1361, 1367 (9th Cir. 1998) ("Because of the different definitions of disability under the ADA and under the various policies of disability benefits-providers, an individual may be disabled—and therefore entitled to disability benefits so long as she is not working—and still be a qualified individual under the ADA because she can work with reasonable accommodations, if her employer will provide them.") (footnote omitted); *Smith*, 727 F.3d at 957 (a statute that required an applicant "to be 'totally unable' to perform his or her current job or any comparable job" did not "require[] a beneficiary or applicant to say that he or she is unable to work even with reasonable accommodation" and thus, "*Smith*'s ADA suit claiming that she can perform her job with reasonable accommodation could prove consistent with her disability-benefit applications stating that she could not perform her job without it"); *Fitzgerald v. Freightliner of Ariz. LLC*, 2019 WL 5579595, *4 (D. Ariz. 2019) ("The SSA . . . does not consider the possibility of reasonable accommodations when determining SSDI eligibility. Accordingly, there are situations in which a SSDI claim and an ADA claim can exist harmoniously.") (internal citation omitted). This conclusion is supported by the fact that Defendant makes no attempt to explain how the particulars of the third-party provider's disability benefits plan are inherently inconsistent with Plaintiff's ADA claim. (*See generally* Doc. 57.)

Turning to the second step of the *Cleveland* analysis, in support of her appeal, Plaintiff described her ability to work as of February 2018 as follows:

> [M]y Mental Disorder of PTSD[] does in fact prohibit me from being able to perform with resonate [sic] continuity the Material Duties of my Own Occupation. Some of these duties include but are not limited to; writing game line-ups, making subjective decisions based on playing time, traveling with the team, issuing consequences for disciplinary actions, dealing with parents and administration and overall supervisory duties of a softball program. As a result of the harassment that has occurred as well as the false accusations that have caused my PTSD, I have developed a significant worry and doubt in my decision making. I am hyper vigilant in-my occupation. I will not even feed a ball into a pitching machine, for fear of an accusation if the player accidentally gets hit.
>
> I feel that this would occur. at any university or academic setting currently, as the second I experience a similar situation as the head softball coach at another athletic program, I will be triggered and have a panic attack. . . . Until I complete my treatment I will not be able to be a head softball coach. Dr. Ritterbush predicted a treatment timeline of 14 months after trauma has ceased. . . .
>
> I do not feel that I can perform my material duties for my Own Occupation, Head Softball Coach, anywhere at the moment.

(Doc. 48-3 at 16-18, emphasis added.) These statements do not negate an essential element of Plaintiff's ADA claim. Instead, they are consistent with Plaintiff's theory that she was unable to work while on medical leave but that, after additional unpaid leave to allow her to complete medical treatment, she may have been able to fulfill her duties as the women's softball coach. Thus, Plaintiff's disability benefits claim does not "genuinely" conflict with her ADA claim. Given this conclusion, it is unnecessary to determine whether Plaintiff has sufficiently explained any inconsistency between her disability benefits appeal letter and her ADA claim.

## 2.    ADA Discrimination

To prevail on her ADA discrimination claim, Plaintiff must establish "(1) that she was disabled under the ADA; (2) that she was a qualified individual with a disability; and (3) that she was discriminated against by her employer because of that disability." *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798-99 (9th Cir. 2017). Defendant does not dispute that Plaintiff was disabled within the meaning of the ADA and, for the reasons discussed above, a genuine issue of material fact exists as to whether Plaintiff was a

"qualified individual."   As for the third element, Plaintiff asserts two theories of discrimination: (1) failure to accommodate and (2) unlawful termination.   (Doc. 54 at 13-16.)[22]

### a.   Failure To Accommodate

An employer engages in unlawful discrimination under the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp*, 889 F.3d at 1095. "The statute . . . places on the employer the burden to demonstrate an undue hardship." *Id.*

As discussed above, "[t]he Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.*   "Recognizing the importance of the interactive process, the Ninth Circuit also held that if an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Id.*

Here, Plaintiff contends that Defendant denied "without reasonable explanation" two of her interview-related accommodation requests: (1) that both Dr. Ritterbush and

---

[22]     Although a failure to accommodate claim and an unlawful discharge claim are often, "from a practical standpoint, the same," *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001), they are "analytically distinct," *Dunlap*, 878 F.3d at 798 (citation omitted). *See also Humphrey*, 239 F.3d at 1139 ("Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability.").

Ekstrand (*i.e.*, Plaintiff's therapist and attorney) be present at the Title IX interview; and (2) that the interview take place "in a safe environment." (Doc. 54 at 14-15.) In its reply, Defendant argues that it "did accommodate Plaintiff when it granted her request to have her therapist present, as well as to permit her to stop the Title IX interview if she had a panic attack or just needed a moment" and further argues that "Plaintiff did not request that her attorney be present at the Title IX interview as a disability accommodation." (Doc. 57 at 4-5, emphasis omitted.) Defendant also contends that it "was not required to grant Plaintiff's request for an off-campus meeting site" and asserts that it provided "numerous" other accommodations, including approving Plaintiff's request to work from home and providing "paid leave benefits." (*Id.* at 5, emphasis omitted. *See also* Doc. 48 at 14 [arguing that Defendant went "above and beyond what it was required to do under applicable law" by granting Plaintiff's "request to work from home and for time off in December 2017" and also granting her "request to have her therapist present at her Title IX interview"].)

The record establishes the following facts. On December 14, 2017, Plaintiff emailed Campbell about the Title IX interview. (Doc. 54-2 at 36.) In the first body paragraph of the email, Plaintiff stated: "My counselor has offered to be my support person . . . . She also recommended[] it may be beneficial to meet at her office, a more comforting and private setting for me. . . . I am picking up the accommodation request paperwork from her this afternoon for my disabilities (PTSD and ADD/Reading and Writing Comprehension Learning Disability) to turn in to you, making these requests." (*Id.*) In the second body paragraph, after asking a question about the interview process, Plaintiff stated: "Lastly, my lawyer . . . said she is very likely going to be available to listen on the phone as we discussed in our first meeting. She will only listen and not be communicating back and forth as we discussed." (*Id.*) In response, Campbell stated: "Our process only allows for one support person to be present . . . . If your counselor is going to be your selection as your support person, I can accommodate your request for Friday December 22 at 8am, but it will need to be in my office. . . . I do not require for you to submit any paperwork

regarding accommodations to me.  Any paperwork requesting accommodations needs to be submitted to . . . Heffelfinger (Human Resources).  Can you clarify, are you making a request for accommodations for this investigative process or for general employment?  I just want to make sure I understand your statements in regards to submission of paperwork." (*Id.* at 35.)  The next day, Plaintiff responded: "Thank you for clarifying.  My counselor will be my support.  I have faxed the disability accommodation form to HR/[Heffelfinger].  I am requesting accommodation for the investigation process." (*Id.* at 37.)  Campbell responded: "I will work with [Heffelfinger] on Monday and have her advise me on what accommodations we will be providing.  I will see you and your counselor here at my office on December 22, 2017 at 8am." (*Id.*)

Meanwhile, Plaintiff's accommodations request form stated that Plaintiff suffers from PTSD, was in a "trauma episode," and was "receiving treatment but may not be stable until this episode is solved." (Doc. 54-4 at 168.)  The form also requested the following "accommodations": "To feel safe while on campus and to have support with her, during her current trauma episode.  [Plaintiff] will have a trauma response when the meeting takes place on campus, 12/22/17.  She may need to be excused during any meetings on campus." (*Id.* at 169.)  Additionally, the form stated that Plaintiff "would feel safer during her current trauma episode being able to provide her documentation in writing rather than verbally.  Since the meeting will be verbal [Plaintiff] would feel safer and less anxious if she could view the questions in writing and take a copy to process in her next counseling session." (*Id.*)

As an initial matter, the Court agrees with Defendant that Plaintiff has not provided any evidence that she requested that her attorney be present at her Title IX interview as a *disability* accommodation.  (Doc. 54 at 15.)  In her emails to Campbell, Plaintiff mentioned her attorney's presence separately from her requested accommodations and gave no indication that it was related to her disability.  (Doc. 54-2 at 35-37.)  Additionally, her accommodations request form did not mention her attorney.  (Doc. 54-4 at 168-69.)

In any event, even assuming that Plaintiff requested her attorney's attendance as a

disability accommodation, Plaintiff's failure-to-accommodate claim based on her interview-related requests fails on the merits. "The fact that [the defendant] failed to provide a *particular* accommodation . . . does not mean that [the defendant] did not provide a *reasonable* accommodation. To prove a violation of the ADA, [Plaintiff] must show that the accommodation that was actually provided was unreasonable." *Annenberg v. Clark Cty. Sch. Dist.*, 818 F. App'x 674, 676 (9th Cir. 2020). Plaintiff has made no effort to do so here. (*See generally* Doc. 54.) Also, after Campbell informed Plaintiff that only one "support person" could attend the interview and that the interview would need to be conducted at Campbell's office, Plaintiff gave no indication that this compromise was unsatisfactory. Instead, after thanking Campbell for "clarifying," Plaintiff notified Campbell that she had "faxed [her] disability accommodation form" to HR (Doc. 54-2 at 35-37); the accommodation form, in turn, does not mention Plaintiff's attorney or the location of the interview (Doc. 54-4 at 168-69). Given this context, it is difficult to fault Defendant for failing to press Plaintiff further to ensure the accommodations offered were reasonable and effective. "The interactive process requires *both* the employer *and* the employee to engage in good faith in order to clarify what the individual needs and identify the appropriate accommodation." *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (internal quotation marks and citation omitted). *See also id.* (the employee's participation is "important" because the employee "generally knows more about his or her capabilities, and 'holds essential information for the assessment of the type of reasonable accommodation which would be most effective'") (citation omitted). Accordingly, to the extent Count Three is based on Defendant's failure to reasonably accommodate Plaintiff during the Title IX interview, Defendant's request for summary judgment is granted.

### b.   **Disparate Treatment**

Plaintiff also claims that Defendant discriminated against her on the basis of her disability by terminating her when her disability leave ended. (Doc. 54 at 15-16. *See also id.* at 16 [describing her termination as "direct discrimination"].) Defendant contends that Plaintiff's disparate treatment claim fails because Plaintiff "proffers no evidence that she

was terminated *because of* her alleged disability." (Doc. 57 at 4.)

To show that an employer terminated an employee because of a disability, it is not enough to show "that a disability was a motivating factor of the adverse employment action." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019). Instead, "ADA discrimination claims under Title I must be evaluated under a but-for causation standard." *Id.* at 1107. *See also Whaley v. Bonded Logic Inc.*, 2020 WL 5593882, *3 (D. Ariz. 2020) (granting summary judgment in the employer's favor where the employee failed "to show facts that the termination would not have occurred in the absence of the alleged discrimination by his former employer").

Here, Defendant contends that "Plaintiff's employment was not terminated 'because of' her disability; it was terminated because she had exhausted all 26 workweeks of her short-term disability benefits and continued to be unable to perform the essential functions of her position." (Doc. 48 at 15.) In response, Plaintiff argues that Defendant's explanation relies, by definition, on the fact that she was disabled. (Doc. 54 at 15-16.)

Defendant's argument misses the mark. By terminating Plaintiff because her short-term disability benefits ended, Defendant effectively determined that she was unable to perform her duties as the women's softball coach, even with reasonable accommodations, as of July 2018.[23] But as discussed, Defendant had an "affirmative obligation" to engage in an interactive process to determine whether an alternative reasonable accommodation was available that would allow Plaintiff to retain her employment. *See also Barnett*, 228 F.3d at 1112 ("[A] employer has a mandatory obligation to engage in the interactive process and that this obligation is triggered either by the employee's request for accommodation *or* by the employer's recognition of the need for accommodation.") (emphasis added); 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate

---

[23] Defendant does not dispute that Plaintiff's inability to perform the functions of her job was due to limitations from her disability. With exceptions not applicable here, "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Dark*, 451 F.3d at 1084 (citation omitted).

an informal, interactive process with the qualified individual with a disability in need of the accommodation.") (cited with approval in *Barnett*, 228 F.3d at 1111-12).  There is no evidence that Defendant considered any possible alternatives to termination.  *See also Hummel v. Maricopa Cty. Adult Prob. Dep't*, 2021 WL 3787544, *3 (D. Ariz. 2021) ("Although leave of unspecified duration may not be a reasonable accommodation where the employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all, an employer is required to at least consider this option.") (cleaned up).  Also, as discussed in earlier portions of this order, Defendant has not demonstrated that the accommodation Plaintiff proposes—additional unpaid medical leave—would have posed an undue hardship to Defendant or was unreasonable on its face.  By terminating Plaintiff for performance inadequacies caused by her disability, without considering the possibility of alternative accommodations, a reasonable juror could conclude that Defendant effectively terminated Plaintiff *because of* her disability.  *See also Humphrey*, 239 F.3d at 1140 ("The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability.")  Accordingly, Plaintiff has presented sufficient evidence to create a triable issue of fact about whether she would not have been terminated but for her disability.  To the extent Count Three is based on a theory of unlawful termination, Defendant's request for summary judgment is denied.

### 3.   ADA Harassment

Plaintiff also alleges that Defendant engaged in "ADA harassment" when Campbell "threatened to disclose Plaintiff's PTSD diagnosis to the reporting parties" and "called Dr. Ritterbush to get more information after the interview was over."  (Doc. 54 at 16.) Defendant contends that Plaintiff's ADA harassment claim fails for two reasons: (1) "[t]he Ninth Circuit has not recognized the theory of ADA harassment in this context"; and (2) "Plaintiff has not set forth any evidence that she was harassed because of her disability." (Doc. 48 at 15-16 & n.14.)

As both sides acknowledge (Doc. 48 at 15 n.14; Doc. 54 at 16), "[t]he Ninth Circuit has not definitively decided whether or not a claim may be asserted under the ADA predicated on an alleged hostile work environment created by disability harassment." *Green v. City & Cty. of S.F.*, 2021 WL 3810243, *48 (N.D. Cal. 2021). *See generally Brown v. City of Tucson*, 336 F.3d 1181, 1189-90 (9th Cir. 2003). Here, for summary judgment purposes, the Court follows the lead of other district courts within the Ninth Circuit in assuming that, *if* such a claim is cognizable, "a plaintiff would have to demonstrate that (1) [she] is a qualified individual with disability; (2) [she] suffered from unwelcome harassment; (3) the harassment was based on [her] disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive working environment; and (5) defendant knew or should have known of the harassment and failed to take prompt remedial action." *Green*, 2021 WL 3810243 at *48. *See also Keller-McIntyre v. S.F. State Univ.*, 2007 WL 776126, *13 (N.D. Cal. 2007). "To assess whether a work environment is sufficiently hostile, courts examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Magee v. Trader Joe's Co.*, 2020 WL 9550008, *18 (D. Or. 2020), *report and recommendation adopted in part*, 2021 WL 1550336 (D. Or. 2021) (citation and internal quotation marks omitted).

The relevant facts are undisputed. During Plaintiff's Title IX interview, Campbell stated that Plaintiff's PTSD diagnosis would be mentioned in the formal investigation report that would be available to the reporting parties. (Doc. 48-2 at 27-28; Doc. 54-2 at 25.) At some point—either during the interview or in later communications—Plaintiff indicated that she was not comfortable with her PTSD diagnosis being disclosed in this fashion. (Doc. 48-2 at 28.) Ultimately, the "final report" did not contain this information. (*Id.*) Also, a few days after the interview, Campbell called Dr. Ritterbush. (Doc. 48-2 at 118.) During the call, Campbell asked if Plaintiff had recorded the interview. (*Id.* at 119.)

Dr. Ritterbush responded that she was not able to speak with Campbell about the case.  (*Id.*)
No other topics were discussed.  (*Id.*)

Even viewing the facts in a light most favorable to Plaintiff, Plaintiff has not raised
a triable issue of fact as to whether the complained-of conduct was "sufficiently pervasive
or severe to alter the conditions of employment and create an abusive working
environment."  *Keller-McIntyre*, 2007 WL 776126 at *13 (citation omitted).  The
environment must be "both objectively and subjectively offensive, one that a reasonable
person would find hostile or abusive, and one that the victim in fact did perceive to be so."
*Farragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  Even assuming that Plaintiff
viewed the conduct as subjectively offensive, Campbell's actions were not so objectively
offensive that a reasonable person would find it hostile or abusive.  "Case law explicitly
requires repeated severe misconduct, such as racial slurs, physical threats, or humiliation,
that rises to the level of 'intolerably offensive' to a reasonable person for such a claim to
be actionable."  *Green*, 2021 WL 3810243 at *49.  Additionally, here, the allegedly
discriminatory conduct only occurred twice.  "Simple teasing, offhand comments, and
isolated incidents (unless extremely serious) will not amount to discriminatory changes in
the terms and conditions of employment."  *Nichols v. Azteca Rest. Enterprises, Inc.*, 256
F.3d 864, 872 (9th Cir. 2001) (cleaned up).

Accordingly, to the extent Count Three alleges harassment in violation of the ADA,
Defendant's request for summary judgment is granted.

C.    **Count Four**

In Count Four, Plaintiff asserts that Defendant retaliated against her, in violation of
Title VII, by (1) placing her on a PIP less than a month after she complained about Blake's
behavior to HR; (2) deciding in January 2018, two months after she complained about
Long's behavior to HR, that Long would replace her for the entire 2018 season; and
(3) pausing the Title IX investigation soon after her attorney threatened legal action against
Defendant.  (Doc. 9 ¶¶ 78-84; Doc. 54 at 12-13.)

"Title VII's antiretaliation provision forbids employer actions that 'discriminate

against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Title VII retaliation "claims follow the same burden-shifting framework described in *McDonnell Douglas*." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). "To establish a prima facie case, the employee must show that [she] engaged in a protected activity, [she] was subsequently subjected to an adverse employment action, and that a causal link exists between the two." *Id.* "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Id.* "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

The Court addresses each instance of alleged retaliatory conduct in turn.

### 1. PIP

As for her prima facie case, Plaintiff contends that "she met with HR on May 1, 2017 to complain[] about Ted Blake's disparate treatment and the sexual remark; and she was given a PIP three weeks later by Ted Blake that cost her a raise that impacted her pay until her termination July 4, 2018." (Doc. 54 at 12-13.)

Defendant contends that Plaintiff has not established a prima facie case of retaliation because Plaintiff's complaints to HR were not protected activity under Title VII. (Doc. 48 at 16-17.) More specifically, Defendant argues that "[a]s for Plaintiff's complaint that Mr. Blake was verbally aggressive, Plaintiff stated that such conduct was because of her poor softball season, *i.e.*, not because of her gender." (*Id.* at 16.)

Conduct constituting "protected activity" under Title VII "includes the filing of a charge or complaint, or providing testimony regarding an employer's alleged unlawful

practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citation and internal quotation marks omitted). "An employee need not establish that the opposed conduct in fact violated [Title VII] in order to establish a valid claim of retaliation." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). "That is, an employee may fail to prove an 'unlawful employment practice' and nevertheless prevail on his claim of unlawful retaliation." *Id.* "However, the opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Id. See also Kurdi v. Cal. Dep't of Trans.*, 2023 WL 267538, *6 (E.D. Cal. 2023) ("[I]f an employee does not sufficiently allege that she opposed discrimination based upon race, color, religion, sex, or national origin, she cannot claim that she engaged in a protected activity."). Here, Plaintiff provides evidence that, during her meeting with Heffelfinger, she "disclosed several examples of . . . Blake treating [her] differently than the male coaches, as well as an example of him making an odd sexual comment about male genitals." (Doc. 54-2 at 3 ¶ 6.) Even if Blake's conduct did not in fact violate Title VII, a reasonable factfinder could conclude that Plaintiff engaged in a protected activity by complaining about his behavior toward her, which she believed was (and characterized as) related to her sex. (*See, e.g.*, *id.* at 20 ["Because I was a female coach, significantly younger in age than him, I was treated as an 'unskilled' softball coach and criticized."].)[24]

Defendant also argues that "there was no temporal proximity or causal link between the (non)protected activity and the end of Plaintiff's employment." (Doc. 48 at 17.) This argument seems to arise from the mistaken assumption that Plaintiff's Title VII retaliation claim is based solely on Plaintiff's termination in July 2018. (Doc. 48 at 17 [noting that the HR complaint "took place in April 2017—approximately 15 months before Plaintiff's

---

[24] During oral argument, Defendant asserted that because Plaintiff's notes regarding her meeting with Heffelfinger do not specifically state that Plaintiff complained about sex-based discrimination during that meeting (Doc. 54-2 at 20), the Court should disregard the portions of Plaintiff's declaration avowing that she raised such complaints during that meeting (Doc. 54-2 at 3 ¶ 6). This argument lacks merit. Any discrepancy between the notes and Plaintiff's declaration is fodder for impeachment, not a reason to disregard Plaintiff's sworn testimony at summary judgment.

employment . . . ended"].)  But in her response brief, Plaintiff clarifies that her Title VII retaliation claim is also based on other adverse actions, including the PIP in May 2017 and resulting missed opportunity for a pay raise.  (Doc. 54 at 12-13.)[25]   In its reply brief, Defendant contends that "Plaintiff provides no causal link between Title VII protected activity and an adverse employment action."  (Doc. 57 at 10.)  Putting aside the fact that this argument is likely forfeited, *Zamani*, 491 F.3d at 997, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339, 360 (2013).  Here, Plaintiff contends that Blake made several comments during her performance evaluation that indicated he knew about, and was frustrated by, her complaints to HR about him.  (Doc. 54-2 at 3 ¶ 10 ["My biggest concern when people complain: they don't come in here and complain."].)[26]  Additionally, Plaintiff was placed on a PIP about three weeks after she complained to HR—"significantly less than the five weeks which the Ninth Circuit has previously found to constitute 'close temporal proximity.'"  *Alozie v. Ariz. Bd. of Regents*, 2020 WL 836528, *2 (D. Ariz. 2020) (collecting cases).  Given Defendant's lack of meaningful argument on the issue, the Court is satisfied that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to causation.

Because Plaintiff has established a prima facie case, the burden of production shifts

---

[25]   The PIP and missed pay raise may qualify as adverse employment actions, which are defined as any action that "is reasonably likely to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1243.  The possibility of becoming ineligible for a pay raise is reasonably likely to deter employees from engaging in protected activity. *See also Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("[A]n undeserved negative performance review can constitute an adverse employment decision.")

[26]   During oral argument, Defendant asserted that because Plaintiff's notes regarding her meeting with Blake "do not mention [Blake's] comment" about complaining to HR, the Court should disregard the portions of Plaintiff's declaration avowing that Blake made such a comment.  Putting aside the fact that, as discussed in an earlier footnote, any discrepancy between the notes and declaration is at most fodder for impeachment, Defendant's argument on this point is factually inaccurate—the notes specifically mention the comment.  (Doc. 54-2 at 19 ["My biggest concern when people complain, they don't[] come in here and complain."].)

to Defendant "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  Here, Defendant explains that "Plaintiff had a poor softball season that ended in April 2017." (Doc. 57 at 9.)  This explanation is supported by the PIP itself, which states that "[t]he current competitive level of the . . . softball program needs to improve to justify the expense of funding and resources.  The overall athlete's [sic] skill level continues to develop slowly and improvement is minimal."  (Doc. 54-2 at 15.)

Thus, the burden shifts back to Plaintiff to show that this articulated reason is pretextual.  "A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Id.* at 1095 (cleaned up).  *See also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006) ("Although some plaintiffs might discover direct evidence that a defendant's nondiscriminatory justification for an employment decision is a pretext, most will not."). "Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative case that the employer is biased. . . .  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'" *Coghlan*, 413 F.3d at 1095 (citation omitted).  The distinction between direct and circumstantial evidence "controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment." *Id.*  "[T]he plaintiff need offer very little direct evidence to raise a genuine issue of material fact," whereas circumstantial evidence "must be specific and substantial to defeat the employer's motion for summary judgment." *Id.* (internal quotation marks and citations omitted).  *See also Brown*, 336 F.3d at 1188 ("Under Ninth Circuit law, circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.") (cleaned up).

Here, Plaintiff contends that the "short temporal proximity" between her HR complaint and the PIP and "the added evidence that . . . Blake had clearly spoken with [Heffelfinger] about the complaint before giving the review," together indicate that Plaintiff's "poor" softball season was not the reason for the PIP, noting that she received an overall "Meets Expectations" performance rating. (Doc. 54 at 13.)

The Court concludes that there is a genuine dispute of material fact as to whether Defendant's proffered reason for the PIP is pretextual. Most important, this is an unusual case in that Plaintiff has proffered direct (rather than circumstantial) evidence that the "poor softball reason" explanation is pretextual—she contends that Blake admitted to her, during the performance-review meeting that preceded the PIP, that his "biggest concern" was the fact that she had made complaints to HR without talking to him first. (Doc. 54-2 at 3 ¶ 10.) At this stage of the case, the Court must accept Plaintiff's testimony on this point as true, and that testimony directly suggests that the true motivation for the PIP was dissatisfaction with Plaintiff's protected activity of complaining about sex-based discrimination to HR.

The temporal proximity between the complaint and the PIP is also evidence of pretext. *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) ("When adverse employment decisions closely follow complaints of discrimination, retaliatory intent may be inferred."). Further evidence of pretext comes from the fact that although Plaintiff received a "Needs Improvement" rating in her May 2017 evaluation for three specific performance objectives—(1) job knowledge and skills; (2) communication skills; and (3) interpersonal relationships—she received a "Meets Expectations" rating for all of the other objectives, including job performance. (Doc. 54-2 at 9.) Viewed in a light most favorable to Plaintiff, a reasonable factfinder could interpret these ratings as inconsistent with Defendant's proffered justification for the PIP. Additionally, beyond stating that Plaintiff had a "poor" softball season, Defendant does not explain the relationship between Plaintiff's performance during the 2017 season and the PIP (*e.g.*, who decided to place Plaintiff on a PIP, how the goals identified in the PIP relate to Plaintiff's performance during the 2017 season) and has not provided any evidence that Plaintiff's 2017 season

was in fact "poor."  During her deposition, Plaintiff described the season as follows: "[W]e went from second place and in a hunt for playoffs and with one loss, we wound up out of the hunt for playoffs at the very end."  (Doc. 48-2 at 22.)  From this testimony, it is not clear whether the 2017 season was particularly poor or whether, consistent with Plaintiff's narrative, Blake was merely critical of Plaintiff.  *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1345 (9th Cir. 1981) ("While it is true that the University need offer little evidence in support of its articulated reason in order to require plaintiff to proceed to step three, the more substantial the University's evidence the more persuasive plaintiff's step three evidence must be in order to establish that the articulated reason is pretextual or was discriminatorily applied.").

Accordingly, to the extent Count Four arises from the PIP, summary judgment is denied.

### 2.   2018 Softball Season

Next, Plaintiff contends that, during the same May 1, 2017 HR meeting, she "made complaints about Jamie Long," "the same individual who decided to replace her for the entire year on January 5, 2018."  (Doc. 54 at 12-13.)  As with Plaintiff's complaint about Blake, Defendant contends that Plaintiff's complaint about Long was "not related to her gender or any disparate treatment" and thus not protected activity under Title VII.  (Doc. 57 at 9 ["[A]s Plaintiff admitted during her deposition, she complained to Human Resources about Ms. Long not following the athletic handbook . . . ."].)

The record supports Defendant's argument.  According to Plaintiff, she complained about "Long not following the Scholar-Athlete Handbook," which required that the coach be present at meetings with the players, because Long "met with [a student] about the [alcohol issue] while . . . the team was on the road."  (Doc. 48-2 at 23.)  There is no evidence that Plaintiff perceived Long's behavior as violative of Title VII and, even if there was, Plaintiff does not explain how this belief would be reasonable.  "The opposition clause, by its terms, protects only those employees who oppose what they reasonably perceive as discrimination under Title VII."  *Kurdi*, 2023 WL 267538 at *6 (cleaned up).  *See also*

*Zakara v. Metals*, 2021 WL 5578876, *5 (D. Ariz. 2021) (plaintiff failed to establish a prima facie case of Title VII retaliation where she "allege[d] that she complained about Muranko's hostility and the lack of training she received but [did] not state that she informed Defendants she believed the inadequate support to be due to her race or national origin").

Accordingly, to the extent Count Four alleges retaliation based on Long's decision to coach the 2018 softball season, Defendant's summary judgment request is granted.

### 3.   Pausing The Investigation

Finally, Plaintiff contends that "there is no question" that Ekstrand's emails to Sevastos "put [Defendant] on notice of possible legal claims, that left [Plaintiff] in Title IX limbo, while [Defendant] sat and ran out the short-term disability clock just four months later." (Doc. 54 at 13.)  Plaintiff also argues that, "given that [Defendant] confirmed Plaintiff wanted the Title IX investigation ended as soon as possible, [Defendant] gives no plausible explanation for 'putting it on hold.'" (*Id.*)  In response, Defendant argues that although "Plaintiff maintains that her attorney threatening legal action in February 2018 was protected activity for which [Defendant] retaliated against her by ending her employment," "Plaintiff's employment ended because she exhausted her 26 workweeks of paid short-term disability leave and was still unable to perform the essential functions of her position or return to work at all." (Doc. 57 at 9.)

Defendant again misunderstands Plaintiff's claim.  Plaintiff contends that Defendant retaliated against her for her attorney's emails by pausing the Title IX investigation, despite knowing that Plaintiff "wanted the Title IX investigation ended as soon as possible," which then exacerbated Plaintiff's PTSD, preventing her from returning to work and thus "left Ms. [Plaintiff] in Title IX limbo . . . while [Defendant] sat and ran out the short-term disability clock." (Doc. 54 at 13.)  Thus, although Plaintiff's eventual termination may be relevant to the damages caused by the alleged retaliation, the adverse action giving rise to Plaintiff's claim was Defendant's decision to pause the investigation against Plaintiff's wishes.

With that clarification in mind, to the extent Defendant intended to challenge the sufficiency of the *causation* evidence supporting this theory of liability, that challenge is unavailing.   The relevant timeline is that Ekstrand, Plaintiff's attorney, began sending emails to and otherwise corresponding with Sevastos, Defendant's general counsel, in late January 2018.  (Doc. 54-4 at 155-56.)  At first, Ekstrand simply introduced herself as Plaintiff's attorney and stated that she "was hoping that we could set up a time to talk about the investigation that is currently going on."  (*Id.* at 156.)  However, after Sevastos sent an email on January 30, 2018 that seemed to suggest (and a reasonable juror could construe as suggesting) that Plaintiff was improperly interfering with the investigation, Ekstrand sent a response email that same day in which she denied some of Sevastos's factual assertions and stated although she "generally respect[ed] the integrity of a school's process was looking into allegations," she was "losing both respect for and patience with this current process for several reasons, one of which is the inaccuracies being reported to you, as well as the tremendous stress it is unnecessarily inflicting on [her] client."  (*Id.* at 154.)  About a week later, on February 6, 2018, Defendant announced to some interested parties (but without telling Plaintiff) that it had paused the investigation.  (Doc. 48-2 at 78-79; Doc. 48-3 at 10.)

During oral argument, Defendant asserted that Ekstrand's January 2018 emails cannot be reasonably construed as protected activity because they did not expressly threaten litigation.  Defendant further argued that Ekstrand did not make such an express threat until late February 2018, and because that threat occurred after the investigation had been paused, causation is lacking.  This argument lacks merit.  Resolving all reasonable inferences in Plaintiff's favor, a juror could construe the January 30, 2018 email from Ekstrand to Sevastos (Doc. 54-4 at 156)—which was sent on the heels of Plaintiff raising various concerns about the legality of Defendant's conduct, raised various additional concerns about how the investigation was being conducted, and suggested that Ekstrand was losing "respect for and patience with" Defendant's conduct—as an implied threat of litigation that qualifies as protected activity.  *See, e.g., O'Neal v. Ferguson Const. Co.*, 237

F.3d 1248, 1254-55 (10th Cir. 2001) ("O'Neal asserts he engaged in protected activity . . . by sending a letter to Ferguson from his attorney. . . .  [Ferguson] disputes the protected status of the letter . . . [but] we agree with O'Neal's characterization of the sending of the letter as a protected activity . . . [and that] the attorney letter is entitled to protected status. . . .  Whether O'Neal or his attorney wrote the letter is wholly irrelevant.  The letter was an informal complaint which disclosed O'Neal's dissatisfaction with his new position.  It specifically characterized the reassignment as retaliatory conduct.  Thus, this court concludes the sending of the letter on September 18, 1997, constitutes a protected activity.") (citations omitted).  The close temporal proximity between this protected activity (email sent on January 30, 2018) and the adverse action (investigated paused on February 6, 2018) is enough to create a jury issue on causation.  *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 316 (E.D.N.Y. 2016) ("[A]fter plaintiffs' attorney sent a letter to the school regarding their concerns about the school and implied that they might initiate legal action if the school failed to comply with their requests, just over a week later, on November 7, J.T. was issued a suspension. . . .  [T]he fact that [the suspensions] followed so closely after plaintiffs' complaints supports an inference that the suspensions were retaliatory.").

Meanwhile, to the extent Defendant intended to show that it had a *legitimate, non-discriminatory reason* for pausing the investigation, the analysis requires some additional steps.  At this point in the analysis, Defendant would bear the burden of production to articulate a legitimate, nondiscriminatory reason for the challenged action.  *Villiarimo*, 281 F.3d at 1062.  At various points in its briefing, Defendant suggests that its reason for pausing the investigation was to support Plaintiff's mental health and recovery.  (Doc. 48 at 5-6 ["[O]n or around February 6, 2018, [Defendant] placed the 2017 Title IX investigation on hold, while Plaintiff was on leave and to support her mental health recovery and treatment."]; Doc. 57 at 7-8 ["[Defendant] halted the 2017 Title IX investigation during Plaintiff's mental health-related leave and never completed it because, after Plaintiff's employment ended, [Defendant] could no longer take any action with

1    respect to Plaintiff."].)[27]   To that end, Defendant's Rule 30(b)(6) representative testified

2    that "the Title IX office investigation was paused, suspended, halted, whatever word would

3    be most appropriate, while [Plaintiff] was on short-term disability. . . .   [W]hile she was

4    out on disability, it was our desire for her to take care of herself, get . . . well."  (Doc. 48-2

5    at 78-79.)

6           Assuming that Defendant's showing on this point was sufficient to meet its burden

7    of production, Plaintiff has met her resulting burden to demonstrate that the proffered

8    reason was pretextual.  The relevant chronology is as follows.  On or about November 6,

9    2017, the Title IX investigation began.  (Doc. 48-2 at 90.)  Upon being informed of the

10   investigation, Plaintiff immediately disclosed that she was suffering from PTSD.  (*Id.* at

11   26.)  The following month, on December 15, 2017, Plaintiff requested "some PTO as well

12   as the holiday to take a break" and expressed her hope that "this will be sufficient in

13   working with [her] counselor to get back to a good place."  (Doc. 48-2 at 112.)  Eight days

14   later, on December 23, 2017, Plaintiff began a leave of absence.  (Doc. 48-3 at 4-5 ¶ 10.)

15   Around the same time, Plaintiff applied for short-term disability benefits through

16   Defendant's third-party insurance provider.  (Doc. 48-2 at 56-57.)  However, Defendant

17   did not pause the investigation based on any of these developments.  To the contrary, on

18   January 8, 2018, Plaintiff submitted her disability leave paperwork and notified Campbell

19   that, while she was on leave, communications should go through her attorney.  (Doc. 48-

20   2 at 53-54; Doc. 54-2 at 34.)  At this point, Plaintiff continued to participate in the ongoing

21   investigation.  (*See, e.g.*, Doc. 54-2 at 28.)  As discussed above, on January 24, 2018,

22   Ekstrand "notified [Defendant's] general counsel Charlie Sevastos that she was

23   representing [Plaintiff]."  (Doc. 54-2 at 6 ¶ 51.  *See also* Doc. 54-4 at 156.)  On January

24   30, 2018, Sevastos sent an email to Ekstrand in which he accused Plaintiff of contacting

26   [27]    The Court notes that Defendant's proffered justification for *not completing* the
27   investigation after Plaintiff was terminated in July 2018 (*i.e.*, because, at that point,
     Defendant would not be empowered to take any action based on the results of the
28   investigation) is not, on its face, a legitimate reason for *pausing* the investigation in
     February 2018, because at that point Plaintiff was still employed and Defendant was still
     empowered to take action based on the investigation's results.

other employees and students while on leave, stated that Defendant would "consider this new information as we move forward with decisions on her status," and further stated "[i]n the meantime I have done what I said I would do at your request based on your statements about her condition." (*Id.* at 155.) On February 6, 2018, Campbell sent an email to the reporting parties stating that the investigation was "on hold until further notice for administrative reasons." (Doc. 48-3 at 10.) However, Defendant did not notify Plaintiff that the investigation was being paused. (Doc. 54-2 at 6 ¶ 57.) Finally, on March 23, 2018, Plaintiff was approved for short-term disability benefits. (Doc. 48-3 at 29-31.)

Based on this chronology, a reasonable juror could conclude that Defendant's proffered reason for pausing the investigation was pretextual. Defendant did not pause the investigation once it became aware that Plaintiff was experiencing mental health issues that required leave and treatment. Instead, it allowed the investigation to continue for more than a month after Plaintiff disclosed that she was suffering from PTSD, requested leave, and submitted her request for short-term disability benefits, pausing it only after Plaintiff's attorney began making what a reasonable juror could construe as legal threats. Plaintiff has also presented evidence that Defendant did not notify her of the pause—a curious omission if the point of the pause was to support Plaintiff's mental health and recovery. Finally, the chronology is also inconsistent with the explanation for the pause that Defendant's Rule 30(b)(6) representative provided, which was that the pause was linked to Plaintiff being "on short term disability." Plaintiff's application for such benefits was not approved until March 23, 2018, more than a month and a half after the pause was instituted.

In addition to these discrepancies, the record establishes that Plaintiff repeatedly asked that the investigation continue while she was on leave and specifically explained that this would help, rather than harm, her mental health. (*See, e.g.*, Doc. 48-2 at 127 [Plaintiff, speaking to Campbell: "Like I told [Heffelfinger], I'm willing to cooperate with this so it can be done. . . . I don't want to keep this going on . . . . Because I can't continue—every time I do my treatment, it's something new."]; *id.* at 199 [Plaintiff, speaking to Campbell: "my lawyer said it could go two ways. I could request the case being stopped, because . . .

of my disability . . . [o]r I can cooperate and just continue . . . .  She said that legally, if I requested, you guys could maybe have to stop, if I go on disability . . . [u]ntil I come back. But I don't want that."]; *id.* [Dr. Ritterbush, speaking to Plaintiff: "So, you're saying, when [Campbell] gets back, if she can finish it, you want to keep going even if you're off?"; Plaintiff: "Yes."]; *id.* [Dr. Ritterbush, speaking to Campbell: "But . . . she has to get it resolved. . . .  Because she's not doing well. . . .  [S]he's had to have these girls on her team.  And this was prolonged so long."].  All of this evidence, viewed in the light most favorable to Plaintiff, could lead a reasonable juror to conclude that Defendant would not have paused the investigation but-for Ekstrand's communications with Sevastos and that Defendant's proffered explanation for the pause is pretextual.

Accordingly, to the extent Count Four alleges retaliation in violation of Title VII based on the decision to pause the Title IX investigation, summary judgment is denied.

### D.   **Count Five**

In Count Five, Plaintiff alleges that Defendant violated the ADA by retaliating against her for requesting reasonable accommodations.  (Doc. 9 ¶¶ 85-91; Doc. 54 at 16-17.)  Specifically, Plaintiff contends that she engaged in protected activity by "asking for permission to work from home in December 2017" and then again by "requesting a second form of accommodation from Campbell."  (Doc. 54 at 16-17.)  As for the first request, Plaintiff asserts that Long retaliated by informing her "that she would not be returning as coach by January 5, 2018, despite there being no issues settled at that time." (*Id.* at 16.)  As for the second request, Plaintiff argues that Campbell retaliated by "threaten[ing] to disclose the PTSD diagnosis to reporting parties and call[ing] her therapist directly."  (*Id.* at 17.)

Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  The *McDonnell Douglas* burden-shifting framework applies to such claims.  *T.B. ex rel.*

*Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472-73 (9th Cir. 2015).  Thus, "[t]o establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi*, 389 F.3d at 849.  "If the employee establishes a prima facie case, the employee will avoid summary judgment unless the employer offers legitimate reasons for the adverse employment action, whereupon the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual." *Id.*

Here, Defendant does not challenge Plaintiff's prima facie case; instead, it jumps to step two of the analysis, arguing that Long's decision to coach the entire 2018 season was a "legitimate business decision to support the student athletes with continuity in coaching." (Doc. 57 at 7.)  After noting that Plaintiff "expressly told Ms. Long that she would be on leave for 6-12 weeks, or when her counselor stated that she could return to work," Defendant explains that "[t]he 2018 spring softball season ran from January 26, 2018 through April 21, 2018" and "[s]ix to 12 weeks after January 5, 2018 . . . gives the dates of February 16, 2018 through March 30, 2018, a mere three weeks before the end of the season." (*Id.* at 6-7.)  Defendant has thus carried its burden of demonstrating a legitimate, non-retaliatory reason for its actions.

As a result, the burden shifts back to Plaintiff to prove that Defendant's explanation is pretextual.  As discussed, "'[c]ircumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.'" *Brown*, 336 F.3d at 1188 (citation omitted).  Here, although Plaintiff disputes the credibility of Defendant's explanation (Doc. 54 at 16-17), she does not provide any conflicting evidence beyond the temporal proximity between her accommodation request and Long's decision.  Additionally, from the Court's perspective, it is entirely logical that a college would wish to ensure the continuity of one of its sports team's coaching staffs and avoid the disruption that would arise from a coaching change with only a few weeks left in the reason.  Finally, as Plaintiff acknowledges, Long granted Plaintiff's request to work from home and the emails between

1    Plaintiff and Long suggest that Long was *supportive* of this arrangement as of December

2    12, 2017.  (Doc. 48-2 at 114.)  Accordingly, to the extent Count Five is based on Long's

3    decision to coach the 2018 season after Plaintiff's request to work from home, Defendant's

4    request for summary judgment is granted.

5         As for the alleged retaliation by Campbell, the Court stated in the tentative ruling

6    issued before oral argument that summary judgment should be denied "Defendant does not

7    assert any summary judgment arguments."  (Doc. 59 at 53.)  During oral argument,

8    Defendant argued that it sought to address this issue on pages 14 and 15 of its summary

9    judgment motion by explaining why, in light of Campbell's agreement to remove the PTSD

10   reference from the final version of the report, "[t]here's no harm there at all."

11        Even assuming this argument was properly raised in Defendant's motion, it fails on

12   the merits.  Plaintiff avowed in her declaration that, when Campbell "said that [the PTSD]

13   information could be disclosed to the reporting parties (the students)," "[t]hat upset

14   [Plaintiff] greatly and made [Plaintiff] cry."  (Doc. 54-2 at 5 ¶ 4.)  This evidence creates a

15   genuine dispute of fact as to whether Plaintiff suffered any harm from the alleged act of

16   retaliation.  Even though there very well may be legitimate, non-discriminatory reasons for

17   Campbell's challenged conduct, summary judgment is not appropriate on Count Five to

18   the extent it is based on the alleged retaliation by Campbell.  *See* Fed. R. Civ. P. 56(f)(2).

19        Accordingly,

20        **IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 48) is

21   **granted in part and denied in part** as discussed herein.

22        Dated this 8th day of September, 2023.

23

24

25   _____

26   Dominic W. Lanza
     United States District Judge

27

28

- 53 -